# Jones *versus* Tatham.

1. By the Act of 14th February, 1838, the Camden and Philadelphia Steamboat Ferry Company was authorized to cut, through the island in the Delaware river opposite to Philadelphia, a passage for the navigation of steamboats and vessels, Provided that the company shall not take exceeding 600 feet in width of the said island, for the purpose of constructing the said passage, the same when made to be a public highway.

By the third section the company was authorized to enter upon and occupy for the purpose of making said canal, any land upon which the same may be located:

Under such authority, in the year 1838 a canal was cut through the island of 150 feet wide, and its width has never been increased:

*Held* that the company had no power to take permanent possession of 600 feet in width of the island and renting it for tillage or dwelling-places, it not appearing that the owners of the island were notified of the claim to 600 feet and participated without objection in assessing damages for it, or were compensated for it.

2. The company is not authorized by the Act to enter upon and occupy, for the purpose of making said canal, any land upon which the same may be located, unless the owner or owners refuse to permit such entry and occupation and the parties cannot agree upon the compensation; and the Common Pleas have no authority to appoint persons to decide upon the question of damages, unless the owners, being not within the disabilities mentioned in the Act, refuse to join in the appointment or neglect to do so after requisition upon them for that purpose; and that the requisites of the Act were complied with should appear in the proceeding.

3. The jurisdiction given to the Common Pleas being a special one should be strictly pursued.

4. The object of the proviso in the Act was to *restrict* the grant.

5. The act of making survey and planting stakes or depositing earth to the extent of 600 feet in width, when no more than 150 feet in width was required for the canal, gave no title to the company to the excessive width.

6. If the island, at the time of the passage of the Act of 14th February, 1838, was the property of the Commonwealth and not of private individuals, the company under that Act derived no title to any part of it.—Words of a statute applying to private rights do not affect those of the *state*: and in order to transfer or affect the rights of *the Commonwealth* the intention to do so should be plainly expressed or necessarily implied.

7. The plaintiff in the case having obtained a patent from the Commonwealth for the *part* of the island in question, describing the nature and extent of his possession and having taken actual possession under it, such possession was good against a wrongdoer without title, or against his own tenant or any person who acquired the possession by collusion with the tenant.

ERROR to the District Court, *Philadelphia.*

This was an action of ejectment, in the District Court, Philadel-

[Jones v. Tatham.]

phia, brought by George N. Tatham, on the 25th of February, 1851, against William Jones, to recover possession of a frame dwelling and lot of about 2¼ acres of land upon Windmill Island, in the river Delaware opposite the city of Philadelphia, lying south of, and adjoining to the canal cut through the said island, and bounded on the south by a fence and a line of trees, and east and west by low water mark of the river Delaware, together with a piece of marsh land adjoining the above on the south 150 feet in width, and extending across the island from low water mark to low water mark, parallel to the first lot above described.

The Camden and Philadelphia Steamboat Ferry Company were admitted to defend as landlord of Jones.

The defendants pleaded not guilty.

On the 11th day of July, 1849, George N. Tatham applied for and procured a warrant of valuation, to be issued from the Land-Office of Pennsylvania, for all that part of Windmill Island lying south of the canal, &c., excepting only " *a lot of two hundred feet front, extending across the island between parallel lines, now in the possession of——— Walls, and formerly claimed by John Church.*"

In the return on this warrant, the island was reported to contain 21 acres and 70 perches, excepting as aforesaid, and the same was valued at $15 per acre, and no more. On the 4th of August, 1849, he, Tatham, procured a warrant of survey of the same, which was returned, and survey accepted August 22d, 1849. On the same day a patent was issued to him for the said 21 acres and 70 perches in consideration of $15 per acre.

These proceedings were taken under the Act of January 27, 1806, in reference to the sale of unappropriated islands in the river Delaware, &c.: 4 *Smith's Laws*, p. 268.

The Camden and Philadelphia Steamboat Ferry Company claimed the premises in question, under an Act of Assembly of the State of Pennsylvania, passed February 14, 1838 (*Pamph. Laws*, 1837–38, p. 25), eleven years prior to the application by Tatham. By that Act, the company were authorized to cut a canal through Windmill Island, opposite the City of Philadelphia, and to take as much of the marsh or flats of the said island as they might deem fit for that purpose, not exceeding 600 feet in width. See the terms of this part of the Act, hereafter stated.

On the part of the company it was alleged, that in pursuance of that Act, the company entered upon, surveyed, and designated, in the year 1838, 600 feet of the said island, for the purpose of constructing the canal, and that the jury of view, appointed under the Act, assessed $2000 as the damages upon the whole 600 feet.

The company commenced cutting and constructing the canal in 1838. They at first cut it in a straight line, through the island, and ran out piers on both sides, and both east and west some distance into the river. The banks were then made slanting and without wharfing. They ran a wooden wharf on the east or Jersey

[Jones *v.* Tatham.]

side of the island, south of the canal, down about 200 feet. They also ran a similar wharf down on the south-western side, about 100 feet south of the canal.

It was found that an eddy was produced in the canal, and that it filled up so· as to be too shallow for use at ordinary tide. They then cut off the south-east and north-west piers, changed the line of direction of the canal, and faced its sides with wooden wharfing; the depth of water was thus improved.

They continued these, and have been making other changes and improvements until within a short time before this suit was brought.

The dirt taken out of the canal was put upon both sides, and on the south for about 200 feet down, which raised the island about four feet. Upon this made earth, trees were either planted or grew spontaneously. The company were the only parties who had any possession or asserted any ownership or control over the premises sued for, from the year 1838 until the claim asserted by Tatham, under his patent. The company had no tenant living there, nor had they any buildings on the premises, but they used them for the deposit of materials and other purposes connected with their work on the canal.

In the latter part of the month of August, 1850, Tatham, without notice to the company, erected a house upon this made ground, within about 100 feet or less south of the canal, and it was said, that occupation of it was had about the 3d of September, 1850. The property was enclosed by a fence. William Jones, one of the defendants, was put into possession of the house in the month of October, 1850, under an agreement with Tatham, the plaintiff, for a lease, which, though written, was never executed. The original paper prepared was placed in Jones's hand and accepted by him. The company gave Jones notice, on the 30th of November, 1850, to quit the premises, or· he would be treated as a wrong-doer and expelled. After receiving this notice, Jones, on 30th November, 1850, agreed in writing with the president of the company to occupy the house by paying to the company a rent to be afterwards agreed upon. And afterwards, a lease, dated 30th December, 1850, was executed by him and the president of the company. On 25th February, 1851, this suit was brought by Tatham against Jones, and the company took defence as his landlord.

The Court charged the jury:

"1. The plaintiff's title is *primâ facie* regular.

"2. As to defendant's title. The defendant has shown a right to enter and take so much as may be necessary for the purpose of constructing a passage, not exceeding 600 feet. They have staked out 600 feet, but have constructed a passage of 150 feet. It appears to me that they have shown no right to enter and occupy

[Jones v. Tatham.]

more than the quantity necessary for the passage. Whether, under their charter, they may or may not have a right to enlarge or alter the course of their canal hereafter, within the limits of the six hundred feet, is a question which does not arise in the present case.

"3. As to the subordinate question of tenancy. If Jones accepted and went into possession under a lease from the plaintiff, and afterwards accepted .a lease from the Ferry Company, they stand in his shoes, and can avail themselves of no defence which he could not."

Defendants' counsel excepted to the charge as above stated.

May 28, 1851, verdict was rendered for the plaintiff.

In the 1st section of the Act of 14th February, 1838, referred to, the said Ferry Company were authorized to cut through the island in the Delaware river opposite the city of Philadelphia, and construct "a passage for the navigation of steamboats and vessels," &c. "Provided the said company shall not take exceeding six hundred feet in width of marsh or flats of the said island, for the purpose of constructing the said passage, and shall construct the same opposite the ferry property belonging to the said company in the cities of Philadelphia and Camden; and the said passage, when completed and made navigable, shall be a public highway, subject to the tolls and regulations hereinafter mentioned."

In the 3d section it was enacted, that whenever it shall be necessary for the company to enter in and upon, and occupy, for the purpose of making said canal, any land upon which the same may be located, if the owner or owners of the said land shall refuse to permit such entry and occupation, and the parties cannot agree upon the compensation to be made for an injury or supposed injury that may be done, &c., in such case the president, &c., may, at all events, enter upon, occupy, and use such lands for the purposes aforesaid, and then and thereafter it shall be lawful for the parties to appoint six persons to estimate such damage, &c., but if the parties cannot agree upon such persons, or if the persons chosen do not decide upon the matter, or if the owner of such land shall refuse or neglect to join in the appointment within 20 days after requisition, or if such owners shall be *feme covert*, under age, *non compos mentis*, or out of the state, then it shall be lawful for the Court of Common Pleas, on application of *either party*, to appoint six persons as viewers, &c. Provided that either party may appeal to the Court, &c., and, upon confirmation of the report or final judgment on appeal, the company paying to the owner the sum specified, in full compensation for such lands, or for the injury, the company shall become seised of the same estate in the lands which the owner held in the same.

It was assigned for error, that the Court erred in permitting

[Jones *v.* Tatham.]

the plaintiff. to give in evidence: 1. His application to the surveyor-general of July 10, 1849, for that part of Windmill Island lying south of the canal.  2. The warrant of valuation, issued by the Board of Property, for same premises, dated July 11, 1849, and return on same, August 1, 1849.  3. The warrant of survey, for same premises, dated August 4, 1849, and return of survey and acceptance, August 22, 1849.  4. The patent to him for same premises, dated August 22, 1849..  5. In refusing to allow the defendants to show as follows, viz.: That the purposes of the canal required that it should be extended more on the east than it is now, and be made more oblique.  6. By John J. Benson, the cost of. the canal.  7. The survey of 600 feet of the island, and that the jury of view viewed and assessed the damages for the whole 600 feet.  8. To give in evidence the record of the proceedings in the Court of Common Pleas, under the Act of February 14, 1838, in the matter of Windmill Island.  9. The application of plaintiff, of October 15, 1849, *for other parts* of Windmill Island, to show that he was acquainted with the title of the Ferry Company.

10. In charging that the title of the plaintiff to the premises in question was *primâ facie* regular.  11. In charging that the Ferry Company had shown no right to enter and occupy more than the quantity necessary for the passage.  12. In charging that, if Jones accepted and went into possession under a lease from the plaintiff, and afterwards accepted a lease from the Ferry Company, the latter stand in his shoes, and can avail themselves of no defence which he (Jones) could not.  Because there was evidence to justify the position that Jones went into possession under the representation by Tatham that he (Jones) would be undisturbed in his possession; and the Ferry Company had a title paramount to that both of Tatham and Jones, and also a right to the immediate possession, and afterwards he (Jones), to prevent being actually expelled from the premises, yielded the possession thereof, and attorned in good faith to the Ferry Company, and in such case this was equivalent to an actual ouster, and was a good defence to this action.

By the proceedings referred to in the *eighth* assignment, it appeared that, on the petition of the Ferry Company aforesaid, the Court of Common Pleas, Philadelphia, in June, 1838, appointed six persons to view the lands upon which the company designed to locate their canal, and to estimate the damage.  The Court directed notice to be given in two daily newspapers, &c., for one month, of the time of meeting of the jurors, and the nature and objects of their appointment.  In all cases of known owners, the notice to be *personal*.  Also, notices to be put up on the island.

In March, 1839, their report was filed.  The damages were esti-

[Jones v. Tatham.]

mated at $2000. Afterwards, an auditor was appointed to examine and report who are the parties in interest. He afterwards made report, to which exception was taken, 1. That he had not reported the evidence on which his report professed to be founded. 2. Because the persons to whom he awarded $1900 of the fund, exhibited no sufficient title to that part of Windmill Island which the company have taken for their canal. 3. In not mentioning *by name* the persons among whom, and in what proportions, the said $1900 is to be distributed.

This appeared to be the last action had in Court in the matter, and it did not appear that the damages had been paid.

The case was argued by *J. C. Bullitt, G. M. Wharton*, and *J. M. Read*, for the company.—It was contended that the judge who tried the cause erred in permitting the plaintiff below to give in evidence his application, warrants of valuation and survey, and his patent for the premises in question, and also erred in charging the jury that his title was *primâ facie* regular. These points are presented in the 1st, 2d, 3d, 4th, and 10th specifications of error.

Admitting that at the time when Tatham procured his patent the title to the premises in question was vested in the state of Pennsylvania, yet he obtained no title by his proceedings. They were without authority of law. After the Declaration of Independence, the title to the river Delaware and its islands, except within the 12 miles circle around New Castle, being in dispute between New Jersey and Pennsylvania, an agreement or treaty was made between them, by which the jurisdiction of the river was settled, and the islands divided: see Act Sept. 20, 1783, 2 *Smith's Laws*, p. 77. By this division Windmill Island was assigned to Pennsylvania. By the Act of Sept. 25, 1786, 2 *Smith's Laws*, p. 388, *this island was annexed to the city of Philadelphia*, and remains a part of it to this day. In Neal *v.* Commonwealth, 17 *Ser. & R.* 67, it is held that the jurisdiction of the city authorities of Philadelphia extends to the Jersey shore.

There are certain parts of the unappropriated lands of the Commonwealth which have never been within the jurisdiction of the land office so as to be the subject of warrant, survey, and patent, as other public lands. One portion of these was the proprietary tenths or manors; another was lands vested in the Commonwealth by attainder; another portion was lands lying in and adjoining the city of Philadelphia; and still another was islands in the navigable rivers. The above principles are sustained by Freytag *v.* Powell, 1 *Wh.* 536; Hunter *v.* Howard, 10 *Ser. & R.* 245; Fisher *v.* Carter, 1 *Wall, Jr.* 69; Bagley *v.* Wallace, 16 *Ser. & R.* 245, Johns *v.* Davidson, 4 *Harris* 512.

This island, being a part of the city of Philadelphia, could not be patented as public lands throughout the state generally are.

[Jones *v.* Tatham.]

But the plaintiff below proceeded under the Act of January 27, 1806. Does this Act apply to Windmill Island? It is a general law directing the sale of islands in the river Delaware.

A general law disposing of the lands of the Commonwealth throughout the state at large, would not apply to the lands of the Commonwealth in and adjoining the city of Philadelphia. And with like reason, a general law disposing of the islands of the Commonwealth, would not embrace an island *within or adjoining the city of Philadelphia.* But further, this Act, by its express terms, only applies to unappropriated islands. The plaintiff below himself gave in evidence the Act of February 14, 1838, authorizing the company to take 600 feet of the island for the purpose of constructing the canal, and also proved the fact that the canal had been cut. This was an appropriation of so much of the island by law, and hence neither this island, or any part of it, could be taken up under the Act of January 27, 1806.

But again: the Act of 1806 provides for selling *all* the land contained in such island or islands. By the second section it is enacted that the officers of the land office (on application made for an island) shall appoint three persons, who shall take an oath to value truly "*all* the lands per acre contained in such island," and "shall then proceed to value the land in such island or islands by going on the same and having regard to the soil, wood, fisheries, other advantages, and local situation thereof," and "having agreed on the real valuation per acre of *all* the land contained in such island or islands," shall certify the same to the land office, &c.

The warrant of survey and patent are both directed to issue for the island thus valued. Throughout, the act applies to *all* the island. The 3d section, which vested a right of pre-emption in actual settlers for three years, gives the pre-emption as to *the whole island,* and does not confine it to so much only as may be enclosed by such settler. By reference also to the Act of March 6, 1793, 3 *Smith's Laws,* p. 94, directing the sale of islands in the Susquehanna, it will be found that there is in that Act an express prohibition against the issuing of warrants "for any less quantity of land than *the whole* of such island." The Act of 1806 being upon the same subject, and very nearly similar in its provisions, may be construed by that of 1793, and if we are to give a meaning to all the words in the Act of 1806, we are compelled to construe it so as to apply exclusively to the whole of an island, and not to any part or parts.

That this construction has been put upon this Act by the land office, appears from the phraseology of the warrants of valuation and survey, and the patent of the plaintiff.

The oath and return on the warrant of valuation also show that while the three persons appointed took an oath to value truly "all

[Jones v. Tatham.]

the land per acre" contained in the island, they did not in fact value *all* the land in the island, but valued only 21 acres and 70 perches of it, at $15 per acre, and *no more!* It was further contended that the valuation was much *too low.*

It was contended, therefore, that defendant in error has shown no title to the premises in question,

I. Because the Act of 1806 does not apply to this island, inasmuch as,

1. This island was a part of the city of Philadelphia, and the Act of 1806 being a general law with reference to islands in the Delaware, would not apply to the city of Philadelphia.

2. By express enactment the Act of 1806 applies only to unappropriated islands, whereas 600 feet of this island were appropriated to the company by Act February 14, 1838.

II. Even supposing the Act of 1806 did apply to this island, the plaintiff has only patented *a part of it,* when the Act provides exclusively for patenting *the whole* of an island.

As to the remaining assignments except the 12th.

In relation to the title of the Ferry Company, it was contended that by the words of the Act of 14th February, 1838, the intention of the legislature was to vest in the company the title of the owners of the island to not more than 600 feet in width, provided the company complied with the provisions of the Act. It was said that the Act of 14th February, 1838, being prior to the adoption of the amended constitution of 22d February, 1838, was governed by the provisions of the constitution of 1790, and that under that constitution it was decided that the provision as to compensation for taking property for public use was complied with, when the Act provided a mode for making compensation after the land had been entered upon: 1 *Barr* 308; 10 *Id.* 96; 20 *Johns.* 735; 18 *Wend.* 17; 8 *W. & Ser.* 462.

It was said that the company had never refused to pay the owners the amount of damage assessed. The report of the auditor was excepted to, because, *inter alia,* the evidences of title were not reported, and because title to the island was not shown. It was contended, 1. That the company entered upon and occupied the whole 600 feet, as contemplated by the passage of the Act of 14th February, 1838.

2. That by so doing, and by the proceedings in the Common Pleas, they acquired a qualified right to the whole 600 feet, and that such right had not been lost by any subsequent occurrence.

3. That the premises in dispute are within the 600 feet, and were in the occupancy of the company when the house was erected.

4. That the qualified right is a right to the possession until the damages are paid, when the fee will vest to the 600 feet.

As to the 12th assignment, it was observed, that the company were in possession when Tatham entered; that Jones took posses-

sion under Tatham under an understanding that he was to hold and enjoy "a quiet possession." That finding that the company claimed the possession, he had a right to refuse to execute the lease, and to accept of a lease from the company, who, it was alleged, had the better title: 2 *Dana* 100; 2 *W. & Ser.* 240; *Id.* 249; 1 *Pa. Rep.* 402; 13 *Met.* 177; 15 *Mees. & W.* 571; *Woodfall's L. & T.* 799.

*P. P. Morris* and *Cadwalader*, for defendant in error.—The house, costing with the appurtenances above $600, was erected in view from the office of the company, and during its erection their boats passed through the canal. The Ferry Company, which was created by an Act of the legislature of New Jersey, passed 5th March, 1836, has no pretence of title except what may be derived from the Act of 14th February, 1838. That Act authorized them to cut a canal through the island for the navigation of steamboats and vessels, provided the said company shall not take exceeding 600 feet in width of the island *for the purpose of constructing the said passage, &c.* The canal was constructed of the width of 150 feet, and was in use in 1840. It is still of that width. It was alleged that when the company determined upon the width of the canal, and constructed it of the width of 150 feet, they exhausted their franchise. The authority was to take for a specific purpose; they were authorized to take not exceeding 600 feet, but they might take *less.* They had no right to take the 600 feet, make a navigable passage of 150 feet wide, and reserve as their own, for other purposes, 225 feet on either side of it, keeping off the owners of the adjoining land from access to the canal, which was to be *a highway*: 11 *Peters* 421; 2 *Barn. & Adol.* 792; 9 *Howard* 172; Pa. Railroad Co. *v.* Canal Commissioners. With the qualification above stated, the legislature had the right to grant the franchise. It is not material that the company staked off 600 feet. They did not consider it necessary for the passage, and did not use it.

The 5th, 6th, 7th, 8th, and 9th specifications are immaterial.

As to plaintiff's title. Possession, with color of title under the patent, was good against the company which had no title. But his title under the patent was good.

The defendant's counsel say that the plaintiff has not obtained the title of the state of Pennsylvania to the island in question; because, they say, this island is in the city of Philadelphia, and that lands within the city or adjoining it are not within the ordinary jurisdiction of the land office. This doctrine was laid down by the District Court of the city and county of Philadelphia, (reported 1 *Wh.* 536), and was no doubt correct. Islands and proprietary reservations, &c., were never within the general jurisdiction of the land office. The liberty land, in and adjacent to the city of Philadelphia, several miles square, had likewise been

appropriated, viz. to the first purchasers, by William Penn; and this and other land in this precinct, so far as not already taken up under the rights of first purchasers, had been subsequently appropriated by the Commonwealth to her own use, or to special uses, and did not come within the general description of common unappropriated or vacant land, for disposing of which the land office was established.

The Act of 25th September, 1786, did not annex this island to the *city* of Philadelphia, but to the *county* of Philadelphia. But this Act has reference simply to *municipal jurisdiction*, and does not affect the plaintiff's claim of title.

The Act of 27th June, 1806, enacted, That the officers of the land office, upon application to them made for a warrant of survey *for any unappropriated island* in the rivers Delaware, Ohio, and Allegheny, or any of their branches which are by law declared public highways, shall and they are hereby directed to issue such warrant under the conditions and limitations hereinafter prescribed. This Act applied to *all* islands in the Delaware, and did not except islands near to the city of Philadelphia.

The authority given by the Act of 1838 to cut a navigable passage or canal, not exceeding six hundred feet, is not an appropriation within the meaning of the Act of Assembly. It is a permission by the Legislature to the company, without reference to the ownership of the island, to destroy so much of the island as was necessary to make the passage; or, in other words, it was a permission to divide the island into two islands, but was not an appropriation of the island, or any part of it, to individual ownership.

It is a mistake to suppose that the Act of 1806 prevents the acquisition of less *than the whole of the island*. The Act simply requires that the three valuers shall be sworn to value *all* the land in the island, and that they shall value *all* the land by the acre. The persons appointed did value the whole island. The Act *is simply directory*, and was meant to secure the Commonwealth from having the valuable parts of islands picked out by purchasers, and the inferior parts left on her hands; but was never meant to compel an applicant to pay for that which the Commonwealth had already granted, or about which she was satisfied. Thus, this Court, in Marcy v. Gardiner, 7 *Watts* 242, in construing the 15th section of the Act of 1785, 2 *Smith's Laws*, 323, which provided that, in making a survey, the deputy surveyors are directed to locate and survey the full amount of land mentioned in any warrant, *in one entire tract*, decided that a warrant might be executed by including within the survey two separate parts of unappropriated land lying on opposite sides of land previously appropriated and improved, and that the enactment was but *directory*. It was offered, on part of the plaintiff, to show that the Wall's lot was held *by title from the state*. But the evidence was overruled. The plain-

tiff did not wish to disturb him, and there is nothing in the Act which made it requisite for him to do so. The Commonwealth was paid *for the whole island.* The exception in the application was but a recognition of a right conferred by the Commonwealth, and it did not abridge the Commonwealth's right to patent, under the Act of 1806, the whole that was unappropriated of the island; and the form used is in accordance with the language of Lord COKE: "Out of a general a part may be excepted, as out of a *manor* an acre, *ex verbo generali aliquid excipitur;* and not a part of a certainty, as out of twenty acres one." *Coke L.* Book 1, § 58, p. 47.

The application, warrant of valuation, valuation and return, warrant of survey, return of survey, and patent were all regular and in evidence.

As to the 12th exception, it was alleged that the company were not in possession, either actual or constructive, of the ground in question, when Jones was put in possession. If the representations of the president of the company induced him to believe that their title was the better one, he should have informed the plaintiff, and redelivered the possession. He cannot dispute the title of his landlord: 5 *Watts* 66, Boyer *v.* Smith; 8 *Watts* 54; *Id.* 536, Cooper *v.* Smith.

The opinion of the Court was delivered, April 4, by

LEWIS, J.—By the first section of the Act of 14th February, 1838, the Camden and Philadelphia Steamboat Ferry Company was authorized to cut through Windmill Island, and construct, for the navigation of steamboats and vessels, "a passage of such dimensions and draught of water as the company shall deem most beneficial to the interests" of New Jersey and Pennsylvania. By the 3d section, the company was authorized "to enter in and upon and occupy, for the purpose of making said canal, any land on which the same may be located." Then follows the necessary provision for assessing compensation, upon the payment of which the company becomes "seised of the same estate in the land which the owner held in the same." Under this authority, in the year 1838, a canal was cut through the island, 150 feet wide, and its width has never been increased. The discretion given to the company to fix the "dimensions" of the canal, being thus exercised, without deciding how far their power is exhausted, it is clear that there is nothing in the language of the Act, so far as it is quoted above, which justifies the slightest pretence for taking possession of *four times the quantity of land* "occupied by the canal," or "necessary for the purpose of making it."

But it is stated by one of the witnesses that "the wooden ties run into the bank of the canal, about 60 feet from the south face" of it. If this be necessary for the purpose of securing the banks of the canal, it is a servitude to which the adjoining land is pro-

[*Jones v. Tatham.*]

perly subjected, as an incident to the principal grant. The right to construct the canal carries with it all the privileges necessary to its perfect enjoyment. And the corporation, on paying compensation, is entitled to hold the easement for such estate as the owner held in the land upon which it is charged. The quality of the interest acquired by the corporation is that of an incorporeal hereditament, and "hereditaments" as well as "lands" are expressly directed by the Act of 1838, to be surveyed and estimated by the viewers. The *quantity* of interest, whether it be a term of years, a life estate, or a fee, is measured by the duration of the estate of the person from whom it is derived. Neither the uses of the canal nor the objects of the Legislature justify the company in taking permanent possession of the adjoining land, and renting it out for tillage or dwelling-places. If the owner may not appropriate the surface of the soil to such beneficial uses as shall not interfere with the canal, it must necessarily go to waste. This is not required by any principle of law or sound policy. Land, in the vicinity of a dense population, is too valuable to permit it to remain unemployed. The earth was given to man for his benefit, and it is his duty to make use of it to the proper limit of its capacity.

If the owner had been notified of the claim to 600 feet, and had participated without objection in assessing its value, or had received the compensation for that quantity of land, the case would stand upon a very different footing. But it does not appear that the proceedings to assess the compensation were conducted with notice to any one having title to the land, or that they have been ratified by consent or by payment of the compensation to any such person. The case must therefore stand altogether upon the extent of the rights conferred by the Act of 1838. That Act does not authorize the company to "enter upon and occupy" even "the land on which the canal may be located," without the preliminary proceedings therein prescribed. If the owner "refuses" permission to enter, and "the parties cannot agree upon the compensation," the next step is, not an entry without permission, but an application to the owner to unite in appointing six suitable and disinterested persons to estimate the damages. If the parties cannot agree upon such persons, or if the owner shall refuse or neglect to join in such appointment "*within twenty days after requisition for that purpose upon him made*," or if the owner shall be *feme covert*, under age, *non compos mentis*, or out of the state, then the Common Pleas, on the application of either party, is authorized to appoint six disinterested persons, "to examine and survey the lands, tenements, or hereditaments," and estimate the injury or damage sustained by reason of the canal. Either party has the right of appeal within thirty days. It may be possible that these preliminary steps were taken by the company before their entry

[*Jones v. Tatham.*]

upon the land, but that is not the question. The question for our decision is, did they *offer to prove* these material facts on the trial." The paper-book is presumed to contain a full statement of the offer. But it does not appear by anything contained in it that the owner "refused permission to enter," or that "the parties could not agree upon the compensation." It is not shown that any application was made to the owner for permission to enter, or that any effort whatever was used by the company to induce the owner to agree upon the compensation. Nor does it appear that any "requisition" was made upon him to unite with the company in appointing men to assess the damages. It is only upon his "refusal," after "a requisition made upon him for the purpose," that the Common Pleas have any authority to appoint persons to decide upon the damages. It is true that this part of the Act does not apply to the case of one who is a *feme covert*, or *under age*, or *non compos mentis*, or *out of the state*. In the case of a non-resident it would be inconvenient and sometimes impossible to make such application, and, in the other cases enumerated, it would be nugatory, because the persons applied to would be incompetent to act. But it does not appear, from the proceedings offered in evidence, that the owner fell within either of the exceptions to the rule, and he was therefore entitled to the privileges prescribed by the Act, before he could be subjected to a jurisdiction and form of proceeding unknown to the common law. The jurisdiction given to the Common Pleas, in this respect, is a special one, contrary to the course of the common law, and must therefore be strictly pursued. It is not shown that the owner was incompetent to act, or was out of the state, or that he was requested to permit an entry, or to agree upon the compensation, or to join in the appointment of men to assess the amount. In the absence of these preliminary steps, the application to the Common Pleas was totally unauthorized, and the whole proceedings were *coram non judice*.

We have purposely postponed, as last to be noticed, in connection with this branch of the case, because least in importance, the *proviso* which prohibits the company, in any event, from taking more than 600 feet in width. As the office and design of this proviso was to *restrict* the grant, it would be an indefensible departure from a well settled rule of construction to give it the effect of *enlarging it*.

The act of making a survey and planting stakes to include 600 feet of land, when no more than 150 feet were required for the purpose of the canal, gave the company no title to it whatever. The extent of the grant, within the limit prescribed, is to be measured by the quantity of land necessarily occupied for its purposes. It is scarcely necessary to add, that the deposit of earth

upon the adjoining land gave the company no title to the land receiving the deposit.

Thus far, we have assumed that Windmill Island was the property of private individuals at the time of the legislative grant of 14th February, 1838. But there is evidence tending to show it was, at that time, the property of the Commonwealth. If this be so, the Ferry Company derived no title under the Act of Assembly. It is apparent, from the Act itself, that the Legislature did not consider that it was granting the state's land. There is not a sentence in the statute indicating such an idea. It authorizes the cutting of a canal through the island, on making compensation to the owners; and every relevant line in the Act shows that private owners alone were intended. The purpose was to exercise the right of eminent domain, and not to grant to the company the land of the state. It was declared that, for a fair compensation, private rights should yield to the intended public improvement. Words of a statute applying to private rights do not affect those of the state. This principle is well established, and is indispensable to the security of the public rights. The general business of the legislative power is to establish laws for individuals, not for the sovereign; and, when the rights of the Commonwealth are to be transferred or affected, the intention must be plainly expressed or necessarily applied. This principle applies with peculiar force to grants of corporate privileges, or franchises, to transfers of public property, and to grants of power to take the property of the citizen without his consent.

Upon the whole, we do not perceive that the Ferry Company has any title to the land. Nevertheless, the plaintiff in ejectment must recover on the strength of his own title. In this case, the plaintiff below obtained a patent from the Commonwealth for a part of the island, including the land in controversy, erected a house upon it, and put the defendant Jones in possession as his tenant. Without stopping to inquire whether the patent was granted in conformity to law, but treating it merely as color of title, describing the nature and extent of the plaintiff's possession and claim, it may be safely affirmed, that the actual possession taken under it was good against a wrongdoer without any title whatever; and was certainly sufficient to entitle the plaintiff below to recover against his own tenant and all who came into possession under or by collusion with him. The jury, under the direction of the Court, have found that Jones, after receiving the possession as the tenant of Tatham, accepted a lease from the Ferry Company. And the Court was undoubtedly correct in stating that, in that case, the Ferry Company "stood in the shoes of Jones, and could avail themselves of no defence which he could not."

The plaintiff in error has no ground to complain of the proceed-

[Jones *v.* Tatham.]

ings in the Court below, and the judgment is therefore to be affirmed.

                                                    Judgment affirmed.