101 A.3d 79

SOUTHEASTERN PENNSYLVANIA TRANSPORTATION
AUTHORITY, Appellee

v.

CITY OF PHILADELPHIA and Philadelphia Commission
on Human Relations, Appellants.

Supreme Court of Pennsylvania.

Argued Sept. 11, 2013.

Decided Sept. 24, 2014.

472

Eleanor N. Ewing, Esq., City of Philadelphia Law Department, for City of Philadelphia and Philadelphia Commission on Human Relations.

Andrew A. Chirls, Esq., Mary Catherine Roper, Esq., David Michael Rosenblum, Esq., Philadelphia, for American Civil Liberties Union of PA and Mazzoni Center.

Ryan Allen Hancock, Esq., Kathy Weaver Morrison, Esq., PA Human Relations Commission, for Pennsylvania Human Relations Commission.

Michael Patrick Gallagher, Esq., Katharine Virginia Hartman, Esq., Patrick Michael Northen, Esq., Holly Rebecca Rogers, Esq., Dilworth Paxson LLP, Philadelphia, Gino J. Benedetti, Esq., Southeastern Pennsylvania Transportation Authority, for Southeastern Pennsylvania Transportation Authority.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, STEVENS, JJ.

## *OPINION*

Justice McCAFFERY.

We granted review in this case principally to clarify the standard for determining whether a municipal ordinance applies to an agency or instrumentality of the Commonwealth. The Commonwealth Court concluded here that the Southeastern Pennsylvania Transportation Authority ("SEPTA") is a Commonwealth agency and therefore not subject to either the provisions of the Philadelphia Fair Practices Ordinance ("FPO"),[1] or the jurisdiction of the Philadelphia Commission on Human Relations ("the Philadelphia Commission"). The Commonwealth Court also concluded that, because SEPTA was not amenable to the Philadelphia Commission's jurisdiction, it had no duty to exhaust its administrative remedies before that agency. For the reasons that follow, we vacate

1. Phila. Code §§ 9–1101–1128.

the order of the Commonwealth Court and remand for reconsideration under the proper standard.

This case has its origins in seven administrative proceedings against SEPTA that individuals instituted with the Philadelphia Commission from July 2007 through April 2009, alleging violations of the FPO.[2] At least two of the administrative complaints included claims of types of discrimination against which the FPO offers protection, but that the Pennsylvania Human Relations Act ("PHRA")[3] does not cover. See Stipulated Facts, ¶ 6–7; R.R. 258a–259a (listing administrative cases). SEPTA filed a motion to dismiss each of the administrative cases for lack of jurisdiction, and the Philadelphia Commission denied the motions. *Id.*

While all seven administrative proceedings were still pending,[4] SEPTA instituted this civil action against Appellants seeking both declaratory and injunctive relief. SEPTA maintained in its complaint[5] that because it is a Commonwealth

2. In general terms, the FPO protects against discrimination: in employment based upon a person's race, ethnicity, color, sex, sexual orientation, gender identity, religion, national origin, ancestry, age, disability, marital status, familial status, genetic information, or domestic or sexual violence victim status; in public accommodations based upon race, ethnicity, color, sex, sexual orientation, gender identity, religion, national origin, ancestry, disability, marital status, familial status, or domestic or sexual violence victim status; and in housing accommodation, commercial property and other real estate opportunities based upon race, ethnicity, color, sex, sexual orientation, gender identity, religion, national origin, ancestry, disability, marital status, age, source of income, familial status, or domestic or sexual violence victim status. Phila. Code §§ 9–1103, 1106, 1108.

3. 43 P.S. §§ 951–963. The PHRA protects most, but not all, of the categories of individuals covered by the FPO. In general terms, the PHRA protects against discrimination in employment, housing, and public accommodation because of race, color, familial status, religious creed, ancestry, handicap or disability, age, sex, and national origin. In addition, it prohibits discrimination based upon the use of a guide or support animal because of the blindness, deafness or physical handicap of the user or because the user is a handler or trainer of support or guide animals.

4. *See* Complaint, ¶ 29; R.R. 50a ("In fact, SEPTA is presently litigating the jurisdiction issue at the [Philadelphia] Commission, to no avail.").

5. Because we are conducting appellate review of an order sustaining preliminary objections in the nature of a demurrer to SEPTA's com-

agency, and Appellants are a political subdivision and a municipal agency, respectively, the FPO does not apply to it, and the Pennsylvania Constitution barred Appellants from exercising jurisdiction over it.[6]

Appellants filed preliminary objections demurring to SEPTA's complaint. Appellants argued that because Philadelphia's powers under the First Class City Home Rule Act[7] extend to enacting and enforcing anti-discrimination laws, the FPO applied to SEPTA and the Philadelphia Commission had jurisdiction over it. Appellants further contended that an original action for declaratory and injunctive relief was inappropriate because SEPTA had to await final agency decisions in the individual administrative cases against it before it could seek appellate review in court. In response, SEPTA pointed out that the statute authorizing the creation of metropolitan transportation authorities, such as SEPTA, provides that such an authority "shall exercise the public powers of the Commonwealth as an agency and instrumentality thereof," 74 Pa.C.S. § 1711(a), and asserted that Philadelphia's authority as a home-rule jurisdiction extends only to the regulation of its municipal affairs. In its brief in opposition to the preliminary objections, SEPTA did not rely upon, or refer to in any manner, the section of its enabling legislation pertaining to sovereign and official immunity. 74 Pa.C.S. § 1711(c)(3). The trial court sustained the preliminary objections and dismissed SEPTA's complaint.[8]

SEPTA appealed to the Commonwealth Court, which reversed. *SEPTA v. City of Philadelphia*, 20 A.3d 558 (Pa. Cmwlth.2011) (*en banc*). A majority of the court concluded that the Philadelphia Commission lacked jurisdiction because

plaint, we treat the material factual allegations of SEPTA's complaint as true and make all reasonable inferences from those allegations in favor of SEPTA, as the party responding to the demurrer. We then ask whether, even taking those allegations and inferences as true, the law says with certainty that SEPTA cannot prevail. *Jones v. Nationwide Prop. and Cas. Ins. Co.*, 613 Pa. 219, 32 A.3d 1261, 1267 (2011).

6. Complaint, ¶¶ 2, 19, 27; R.R. 46a, 49a–50a.

7. 53 P.S. §§ 13101–13157.

8. Trial Court Order, dated 11/9/09; R.R. 24a.

SEPTA is an "agency and instrumentality" of the Commonwealth and therefore within the jurisdiction of the Pennsylvania Human Relations Commission (the "State Commission"). The majority noted that the State Commission is responsible for the administration of the PHRA, which bans any "employer" from engaging in certain forms of discrimination. 43 P.S. §§ 955, 956(a). Because the PHRA defines "employer" as including "the Commonwealth or any political subdivision or board, department, commission or school district thereof," [9] and because neither the PHRA nor the FPO explicitly grants the Philadelphia Commission jurisdiction over SEPTA, the majority concluded the State Commission—and not the Philadelphia Commission—had jurisdiction over SEPTA. The Commonwealth Court did not base any portion of its reasoning upon the section of SEPTA's enabling legislation pertaining to sovereign and official immunity. 74 Pa.C.S. § 1711(c)(3). Because the majority considered the State Commission's jurisdiction over SEPTA to be clear, and a Commonwealth instrumentality's challenge to "the scope of a governmental body's action pursuant to statutory authority" through a declaratory judgment action to be proper, the majority also concluded that SEPTA had no duty to exhaust its administrative remedies before seeking relief in court. *SEPTA v. City of Phila., supra* at 563.

Now–President Judge Dante Pellegrini dissented. He concluded that SEPTA is not a Commonwealth agency, and even if it were, it would still be subject to the provisions of the FPO and the jurisdiction of the Philadelphia Commission. The dissent stated that the General Assembly had enacted the portion of SEPTA's enabling act that provides that a metropolitan transportation authority such as SEPTA is "an agency and instrumentality thereof" merely to avoid constitutional and statutory questions, such as limitations on local governments' acquisition of debt. 74 Pa.C.S. § 1711(a). The dissent opined that the cited language was not intended to render SEPTA a state agency for all purposes.

9. 43 P.S. § 954.

The dissent then concluded that even if SEPTA were part of the Commonwealth government, it nonetheless would be subject to the jurisdiction of the Philadelphia Commission under *Commonwealth v. Ogontz Area Neighbors Association,* 505 Pa. 614, 483 A.2d 448, 452 (1984). In that case, the Department of Public Welfare ("DPW")—which we characterized as "an agency of the Commonwealth"—applied to the City of Philadelphia for the permits needed to build a facility for the mentally handicapped. *Id.* at 449–50. The City denied the permits on the ground that the proposed facility did not comply with use and other restrictions under the Philadelphia Zoning Code. On review in this Court, we rejected the notion that DPW was immune from local land regulations because it had the power to condemn property to establish the facility it sought to construct. We reasoned that because the General Assembly had established both the City and DPW, and had fixed the extent of each entity's powers, we would need to examine the enabling act of each entity to determine which entity's authority the legislature had intended to prevail for purposes of the parties' controversy. Because the applicable statutes did not clearly state which entity the legislature had intended to be "preeminent," we applied the rule of statutory construction that a court may determine legislative intent by considering "the consequences of a particular interpretation." *Id.* at 455 (citing 1 Pa.C.S. § 1921(c)(6)). Because Philadelphia's zoning scheme would have been frustrated if DPW were to have prevailed, while subjecting DPW to local zoning rules and restrictions would not necessarily have frustrated DPW's mandate to establish mental health facilities, we concluded that the legislature had intended the City to have priority in the circumstances at issue.

The dissent here applied the principles we set forth in *Ogontz* and concluded that, as in *Ogontz*, the relevant statutes were ambiguous as to which entity was intended to have priority. The dissent therefore considered the effect of holding each entity preeminent and determined that ruling in SEPTA's favor would frustrate the legislature's intended scheme. Characterizing the PHRA as granting the State and

Philadelphia Commissions "concurrent jurisdiction," the dissent explained that deeming SEPTA "preeminent" over Appellants would thwart the legislatively established system of shared jurisdiction. The dissent explained that, on the other hand, treating Appellants as "preeminent" would not interfere with SEPTA's purpose of providing public transportation. The dissent stated, "All the consequence of the City's and the [State Commission's] preeminence means is that SEPTA would still have to respond to complaints, like private companies, of those choosing to file their claims of unlawful discrimination with [the Philadelphia Commission]." *SEPTA, supra* at 569 (Pellegrini, J., dissenting).

Appellants sought allowance of appeal, which we granted to decide the following questions:

(1) Does the City have power to protect its residents from acts of discrimination by SEPTA, a metropolitan transportation authority, where the Pennsylvania Human Relations Act explicitly states that nothing in the PHRA shall be deemed to repeal or supersede any of the antidiscrimination provisions of any municipal ordinance, the City's power to regulate discrimination is not sourced in the PHRA, the City's ordinance extends by its terms to SEPTA as an employer and provider of public accommodations, and concurrent state and local jurisdiction would not adversely affect SEPTA's core transportation mission?

(2) Should the City's Commission on Human Relations have been permitted, following the well-established rule of administrative exhaustion, to determine any challenges by SEPTA to its jurisdiction in the first instance, thereby having the opportunity to make findings on a developed factual record suitable for appellate review as to the nexus between the City's interests and the alleged discrimination, rather than the Commonwealth Court ruling on an abstract, premature challenge?

*SEPTA v. City of Philadelphia,* 619 Pa. 468, 65 A.3d 292, 292–93 (2013).

**Appellants' Authority over SEPTA**

■ The first issue involves statutory interpretation, and as in all such matters, we follow the dictates of the Statutory Construction Act. *Commonwealth v. Janssen Pharmaceutica, Inc.*, 607 Pa. 406, 8 A.3d 267, 275 (2010).

Appellants echo the position of the Commonwealth Court dissent regarding the first issue. They argue that SEPTA is not "the Commonwealth" simply because its enabling act states it is a Commonwealth "agency and instrumentality," and even if it is the equivalent of "the Commonwealth," it is nonetheless subject to the jurisdiction of the Philadelphia Commission.

Appellants contend that the statutory declaration that metropolitan transportation authorities such as SEPTA are agencies and instrumentalities of the Commonwealth is not determinative of this issue. Appellants point out that we recently held, in *Goldman v. SEPTA*, 618 Pa. 501, 57 A.3d 1154 (2012), that despite SEPTA's statutory classification as a Commonwealth agency, it is not entitled to assert in Pennsylvania courts the Commonwealth's Eleventh Amendment immunity against suits under the Federal Employers Liability Act. *Goldman v. SEPTA, supra* at 1180. Appellants characterize *Goldman* as the latest in a line of our cases addressing, in various contexts and with varying results, whether an authority statutorily designated as a Commonwealth agency is properly treated as part of the state government.[10] Appellants

10. *Compare Blount v. Phila. Parking Auth.*, 600 Pa. 277, 965 A.2d 226, 231 (2009) (holding that parking authority was subject to Commonwealth Court's original jurisdiction); *James J. Gory Mech. Contracting, Inc. v. Phila. Housing Auth.*, 579 Pa. 26, 855 A.2d 669, 672 (2004) (holding that although housing authority's enabling act designated it a Commonwealth agency, the General Assembly did not intend it to be subject to Commonwealth Court's original jurisdiction); *T & R Painting Co., Inc. v. Phila. Housing Auth.*, 466 Pa. 493, 353 A.2d 800 (1976) (holding that housing authority was not subject to Commonwealth Court's original jurisdiction); with *SEPTA v. Bd. of Revision of Taxes*, 574 Pa. 707, 833 A.2d 710, 718 (2003) (holding that SEPTA, as a Commonwealth agency, was immune from local real estate tax for portions of its building used in furtherance of its statutory purpose, but not for portions rented to commercial entities); and *Feingold v. SEPTA*,

maintain that our decisions in the cases they cite are consistent in that in each case, we did not consider the statutory declaration to be determinative of whether the authority could lay claim to the rights and prerogatives of the Commonwealth.

Appellants further argue that instead of treating the jurisdiction of the State Commission over SEPTA as a bar to the Philadelphia Commission's authority over SEPTA, the Commonwealth Court should have applied the legislative intent analysis of *Ogontz, supra.* According to Appellants, the applicability of the PHRA to SEPTA would only be relevant here if either: (1) the PHRA preempted the FPO; or (2) the PHRA were the sole source of Philadelphia's authority to enact the FPO. Appellants argue that neither is the case. They assert that SEPTA has conceded that the PHRA does not preempt the FPO, and that Philadelphia's power to enact the FPO flows not from the PHRA, but rather from the First Class Cities Home Rule Act. *See supra* n. 7. Appellants further contend that because Philadelphia is a home-rule jurisdiction, its ordinances are "presumed to be valid, absent a specific constitutional or statutory limitation." Appellants' Brief at 32 (quoting *In re Petition to Recall Reese*, 542 Pa. 114, 665 A.2d 1162, 1164 (1995)). Because SEPTA has identified no such limitation, Appellants argue the FPO should be presumed lawful.

In the alternative, Appellants maintain that even if SEPTA is deemed a state agency or instrumentality, it is properly subject, under *Ogontz,* to the provisions of the FPO and the jurisdiction of the Philadelphia Commission. Appellants assert that because, as in *Ogontz,* the words of the relevant statutes do not clearly resolve the question before us, we should consider the consequences of the respective interpretations the parties suggest. Appellants maintain that they prevail under such an analysis because SEPTA's purpose of providing public transportation will not be impeded if SEPTA is subject to the FPO. Appellants state that on the other hand, the additional protections of the FPO will be significantly

512 Pa. 567, 517 A.2d 1270, 1276 (1986) (holding that SEPTA was immune from punitive damages).

hampered if a major employer and transportation provider such as SEPTA is determined to be exempt from the ordinance.

In response, SEPTA argues that the City may not apply the FPO to a Commonwealth agency and instrumentality, such as SEPTA. Citing *Board of Revision of Taxes, supra; Hoffman v. Pittsburgh*, 365 Pa. 386, 75 A.2d, 649, 654 (1950); and *Jones v. Tatham*, 20 Pa. 398, 8 Harris 398, 1853 WL 6260 (1853), SEPTA argues that legislation does not affect the rights of the Commonwealth in the absence of an explicit statement or a clear indication from the legislature to the contrary. Disclaiming any preemption argument, SEPTA asserts that the Commonwealth Court majority cited the legislature's explicit grant to the State Commission of authority over state agencies merely to illustrate that the General Assembly is capable of making such an express authorization when it wants to. On a policy note, SEPTA argues that because its operations extend across county lines, subjecting it to the FPO will result in "regulatory chaos." Appellee's Brief at 12.

SEPTA then challenges Appellants' reliance on *Ogontz*. It argues that the *Ogontz* analysis is only applicable where a state agency attempts to use real property in a way that conflicts with a local municipality's zoning ordinances. SEPTA argues that its interpretation of *Ogontz* is supported by our holding in *Board of Revision of Taxes, supra*, that property SEPTA owned, but leased to a commercial entity, was not immune from local taxes.

Finally, SEPTA contends that it prevails even under Appellants' *Ogontz* analysis, characterizing as not credible Appellants' assertion that exempting SEPTA from the FPO will significantly weaken the ordinance. SEPTA asserts that the City amended the FPO's definition of covered "employers" to add major Philadelphia employers other than SEPTA only after SEPTA instituted this litigation. SEPTA states that the earlier absence of major employers from the definition undercuts Appellants' argument that not enforcing the FPO against it will undermine the FPO's effectiveness, as other significant employers were previously free from the FPO's constraints.

SEPTA also pointedly asserts that prior to this suit, the Philadelphia's Commission's website stated that it "does not have jurisdiction over state or federal agencies [or] authorities. . . ." Appellee's Brief at 2.

Both sides' arguments are persuasive in part. SEPTA is correct that its enabling legislation plainly states that it "exercise[s] the public powers of the Commonwealth as an agency and instrumentality" of the Commonwealth. 74 Pa.C.S. § 1711(a).[11] Contrary to SEPTA's contentions, however, that is not the end of the matter.[12]

 In a series of cases beginning with our decision in *Ogontz*, *supra*, this Court has held that a Commonwealth agency's challenge to a municipality's exercise of authority over it does not represent "a contest between superior and inferior governmental entities, but instead a contest between two instrumentalities of the state." *See Ogontz*, *supra* at 452; *County of Venango v. Borough of Sugarcreek*, 534 Pa. 1, 626 A.2d 489, 490 (1993); *Hazleton Area Sch. Dist. v. Zoning Hearing Bd.*, 566 Pa. 180, 778 A.2d 1205, 1210 (2001). That is, because the legislature authorized the creation of both entities, and set the limits of each entity's authority, our task is to determine, through an examination of the relevant statutes, which entity the legislature intended to have preeminent powers. *Ogontz*, *supra* at 452. In short, "[t]he problem, essentially, is one of statutory interpretation." *Id.* Our standard of review of such a question of statutory interpretation is de novo, and our scope of review is plenary. *Hazleton*, *supra* at 1213.

 As identified in *Hazleton*, our opinion in *Ogontz*, *supra* sets forth the analytical process a court is to follow to determine which entity the legislature intended to have preeminent powers over a given area of regulation.

11. In its brief to this Court, SEPTA again does not rely upon, or refer to in any manner, the section of its enabling legislation pertaining to sovereign and official immunity, 74 Pa.C.S. § 1711(c)(3).

12. To be clear, we need not, and do not, determine whether SEPTA is properly treated as a Commonwealth agency for all purposes.

The first step requires the reviewing court to determine, through examination of the statutes, which governmental entity, if any, the General Assembly expressly intended to be preeminent. *Id.* In the event there is no such express legislative mandate, the second step requires the court "to determine legislative intent as to which agency is to prevail ... turn[ing] to the statutory construction rule that legislative intent may be determined by a consideration, *inter alia,* of the consequences of a particular interpretation."

*Hazleton, supra* at 1210 (quoting *Ogontz, supra* at 455 (citing in turn 1 Pa.C.S. § 1921(c)(6))) (emphasis omitted).

Thus, in accordance with *Ogontz, Venango,* and *Hazleton,* SEPTA is wrong in asserting that, in order for a local governmental agency to prevail over a Commonwealth agency or instrumentality, the legislature must have clearly stated its intent in that regard. Rather, pursuant to this line of cases, we have applied the Statutory Construction Act in order to discern the legislature's intent. *See Hazleton, supra* at 1213 (applying *Ogontz* to determine that school district's authority to lease school grounds to others for recreational purposes did not trump local zoning code); *Venango, supra* at 492 (applying *Ogontz* to conclude that county's statutory authority to use its property for jails was subject to borough's zoning ordinance). SEPTA has mistaken our insistence that courts seek out and effectuate the intent of the legislature for a requirement that the legislature state its intent clearly or explicitly that a municipality is to have "preeminent powers" over a state agency in a given area of law. Indeed, we concluded in *Ogontz, supra,* that Philadelphia **could** enforce its zoning code against DPW even though we could not discern from the face of the applicable statutes the legislature's intent as to which of the governmental entities was intended to have priority. And, contrary to SEPTA's suggestion and the dissent's approach, nothing in the *Ogontz/Venango/Hazleton* line of cases, or the reasoning behind those decisions, suggests that this analysis is restricted to conflicts over the applicability of zoning laws.

SEPTA's argument essentially is that the structure of Pennsylvania government imposes an implicit limitation on Phila-

delphia's powers and bars it from regulating the state, its agencies, or instrumentalities in the absence of the General Assembly's clear indication to the contrary. But SEPTA's argument runs counter to *Ogontz/Venango/Hazleton*, which instructs us that, rather than being a competition between "superior" and "inferior" governmental entities, the issue is one of legislative intent.

For similar reasons, we conclude that Appellants' reliance on home-rule principles is misplaced. We consider the rule that a home-rule municipality's exercise of legislative power is presumed valid, absent a specific constitutional or statutory limitation, to relate to a municipality's authority to enact ordinances regarding a particular subject matter. That rule does not pertain to whether the municipality may enforce ordinances and regulations against a Commonwealth agency or instrumentality. We view the latter question as properly resolved under the *Ogontz/Venango/Hazleton* legislative intent analysis.

The cases on which SEPTA relies do not indicate otherwise. In *Board of Revision of Taxes, supra,* we held that although portions of a building owned and used by SEPTA were exempt from local taxation, other portions leased to private commercial enterprises, were subject to local real estate tax. We reached that conclusion by applying the longstanding presumption that a Commonwealth agency is immune from taxation when acting within its authorized governmental purposes and powers. *Id.* at 712 (citing *Del. County Solid Waste Auth. v. Berks County Bd. of Assessm't Appeals,* 534 Pa. 81, 626 A.2d 528 (1993)). We stated that nothing in the statute authorizing SEPTA to lease its property to others provided any basis for concluding that SEPTA had been absolved from paying real estate tax for property used for "such a commercial venture." *Id.* at 717.

Our opinion in *Board of Revision of Taxes* thus addressed an issue not presented here: whether "a governmental agency or instrumentality [may] automatically claim immunity from local real estate taxation for property leased to third-party

commercial entities." *City of Phila. v. Cumberland County Bd. of Assessm't Appeals,* 81 A.3d 24, 51 (2013). Moreover, to the extent local taxation is an exercise of municipal power, our treatment of the tax immunity issue in *Board of Revision of Taxes* is consistent with our application of the *Ogontz/Venango/Hazleton* test here. In both instances, we have sought to enforce the legislature's allocation of authority. We explained in *Board of Revision of Taxes* that we could not presume that the legislature's general grant of taxing power to local municipal governments was "meant to include property owned by the Commonwealth, since to allow such taxation would upset the orderly processes of government." *Id.* at 713. That is, allowing municipalities to tax Commonwealth real estate would, in effect, allow local municipalities to override the legislature's allocation of Commonwealth tax revenues, an outcome we could not reasonably endorse in the absence of an indication from the legislature that it intended such a result. See 1 Pa.C.S. § 1922(1) (courts are to presume that the legislature does not intend an unreasonable or absurd result); *Commonwealth v. Dauphin County,* 335 Pa. 177, 6 A.2d 870, 872 (1939) ("The legislators did not intend to upset the orderly processes of government by allowing the sovereign power to be burdened by being subjected to municipal taxes."). We did not rely on the status of one entity as part of the Commonwealth government to resolve the dispute; rather, we engaged in the familiar processes of statutory construction to divine the legislature's intent as to which entity should prevail.

■ Nor do *Hoffman v. Pittsburgh, supra,* and *Jones v. Tatham, supra,* require a different outcome. SEPTA cites statements in each of those cases to the effect that "[w]ords of a statute applying to private rights do not affect those of the state." Appellee's Brief at 10 (quoting *Jones, supra,* 1853 WL 6260, at *12); see also *Hoffman, supra* at 654. While that statement is correct as a very general proposition, its application is limited. As we explained in *In re Public Parking Authority of Pittsburgh,* 366 Pa. 10, 76 A.2d 620, 621 (1950), the rule SEPTA cites is limited to cases "where there is a conflict between the sovereign power of the Commonwealth

and the private rights of individuals, or whether the sovereign intended to make itself liable for torts of its servants, or whether the sovereign intended to pay interest on its obligations." This case falls into none of those categories. We are not faced here with a conflict between the Commonwealth and an individual; a controversy over the Commonwealth's liability under the doctrine of *respondeat superior*; or a question about whether the Commonwealth should pay interest on an obligation. Rather, we consider a dispute between two Commonwealth-created entities regarding the circumstances under which one of the entities may be subject to the authority of the other.[13]

In addition, we reject SEPTA's suggestion that a ruling in Philadelphia's favor here will risk extra-territorial application of the FPO and subject SEPTA to "regulatory chaos." Extra-territorial enforcement of the FPO is precluded by the First Class Cities Home Rule Act, which bars cities of the first class, *i.e.*, Philadelphia, from "exercis[ing] any powers or authority beyond the city limits, except such as are conferred by an act of the General Assembly...." 53 P.S. § 13133. No one has cited any statute remotely suggesting the FPO is viable outside of Philadelphia, and we are aware of none. Furthermore, the potential that Philadelphia might in some instance or instances attempt extra-territorial enforcement of the FPO against SEPTA, is not truly relevant to the disposition of this declaratory judgment action. The issue here is whether, as a matter of law, the FPO and the Philadelphia Commission can ever have authority over SEPTA. The possibility that, in a particular case, the Philadelphia Commission might seek to apply the FPO outside Philadelphia has no

13. While SEPTA has not asserted the section of its enabling legislation pertaining to sovereign and official immunity, the Chief Justice dissents on the basis that pursuant to 74 Pa.C.S. § 1711(c)(3), SEPTA enjoys sovereign immunity in this case because the General Assembly has not expressly waived SEPTA's immunity from administrative proceedings. Concurring and Dissenting Opinion at 493–94, 101 A.3d at 94. However, when presented with two competing absolutes—here sovereign immunity and the authority of Philadelphia to enforce its ordinance, we employ the tools of statutory construction and interpretation to resolve the conflict. *See Frazier v. W.C.A.B. (Bayada Nurses, Inc.)*, 616 Pa.592, 52 A.3d 241, 247 (2012).

bearing on the overarching legal question we address here—which entity the General Assembly intended to have priority. Any attempt at extra-territorial enforcement of the FPO will be properly dealt with if it ever arises.

Finally, SEPTA's arguments regarding alleged changes to the Philadelphia Commission's website and the FPO's new and more inclusive definition of employer after SEPTA initiated this case are not relevant. The issue here is whether the General Assembly intended for the Philadelphia Commission and the FPO to have jurisdiction over SEPTA. Because the FPO was enacted by Philadelphia City Council, the provisions of the FPO are not evidence of the General Assembly's intent. For similar reasons, any statements on the Philadelphia Commission's website are likewise not relevant.

In summary, we reiterate that the legislative intent analysis set forth in *Ogontz/Venango/Hazleton* represents the proper analysis for deciding this issue. Because the Commonwealth Court did not conduct that analysis, we vacate its order and remand the case for it to do so in the first instance.

### Administrative Exhaustion

██ Appellants maintain that the Commonwealth Court erroneously concluded that SEPTA had no need to exhaust its administrative remedies through the Philadelphia Commission before commencing suit. Appellants argue that we have consistently held that an administrative agency is competent to determine its own jurisdiction, and that SEPTA is not subject to any exception to that rule. SEPTA responds that it did not need to exhaust its administrative remedies before the Philadelphia Commission, contending that a party may bypass an agency's procedures and instead immediately seek declaratory relief in court to challenge that same agency's jurisdiction.

 As a rule, where an adequate administrative process is available, a party may not forgo that process in favor of seeking judicial relief. *Bayada Nurses, Inc. v. Com., Dep't of Labor and Indus.*, 607 Pa. 527, 8 A.3d 866, 875 (2010); *Empire Sanitary Landfill, Inc. v. Commonwealth, Dep't of Envtl.*

*Res.,* 546 Pa. 315, 684 A.2d 1047, 1053 (1996). Instead, the party must first exhaust its administrative remedies before proceeding to court. However, an exception exists for cases in which a litigant makes a purely legal challenge to an agency's jurisdiction. *Id.* at 1054. In such a case, the litigant may seek declaratory and injunctive relief in court without first exhausting its administrative remedies. *Mercy Hospital of Pittsburgh v. Pennsylvania Human Relations Comm'n,* 499 Pa. 132, 451 A.2d 1357, 1359 (1982), is distinguishable. There, the provision of the PHRA under which the commission had sought to proceed pertained only to cases of discrimination in employment relationships, and the hospital argued that it had no employment relationship with the complainant. We concluded that equitable jurisdiction was not available in that case because the commission was competent to resolve the factual question of whether an employment relationship existed. Here, in contrast, we are confronted with a purely legal challenge to an agency's jurisdiction, not a factual one. Under our precedents, SEPTA was not required to exhaust its administrative remedies.

In conclusion, although the Commonwealth Court correctly determined that SEPTA was not required in this instance to exhaust its administrative remedies before commencing this declaratory judgment action, it erred by not applying the *Ogontz* legislative intent analysis to determine whether SEPTA may properly be held to the provisions of the FPO and the jurisdiction of the Philadelphia Commission. We therefore vacate the Commonwealth Court's order and remand the case to that court for it to conduct that analysis.

Justices BAER, TODD and STEVENS join the opinion.

Chief Justice CASTILLE files a concurring and dissenting opinion.

Justice EAKIN files a concurring and dissenting opinion.

Justice SAYLOR files a dissenting opinion.

Chief Justice CASTILLE, concurring and dissenting.

I concur with the Majority's conclusion that SEPTA was not required to exhaust administrative remedies within the Philadelphia Commission on Human Relations ("Commission") prior to turning to our courts for a declaratory judgment as to the legal question of whether the Commission has jurisdiction over SEPTA concerning the City of Philadelphia's ("City") Fair Practices Ordinance ("FPO"). I respectfully dissent, however, from the Majority's conclusion that the analysis set forth in *Department of General Services v. Ogontz Area Neighbors Association*, 505 Pa. 614, 483 A.2d 448 (1984), and later employed in similar land use cases, represents the proper analysis for determining whether SEPTA is subject to the FPO such that it may be compelled to appear before the Commission to participate in proceedings adjudicating SEPTA's alleged violations of the FPO—an issue not presented in *Ogontz* or its progeny. In my view, SEPTA is not properly subject to the FPO, and the *Ogontz* test, employed by this Court to date in resolving conflicts between governmental entities concerning the use of land, is inapposite to resolving the issue presented in this case.

In *Ogontz*, this Court was called upon to determine: "whether the Zoning Board of Adjustment of the City of Philadelphia ... ha[d] the power to enforce its regulations as to use and structural requirements for buildings against the Department of General Services, an agency of the Commonwealth." *Id.* at 449. Similarly, in *County of Venango v. Borough of Sugarcreek, Zoning Hearing Board*, 534 Pa. 1, 626 A.2d 489 (1993), the second case upon which the Majority relies, this Court was called upon to determine "whether the powers of Venango County ... [were] pre-eminent over the Zoning Ordinance adopted by Sugarcreek Borough. . . ." *Id.* at 489. Likewise, in *Hazleton Area School District v. Zoning Hearing Board*, 566 Pa. 180, 778 A.2d 1205 (2001), the third case upon which the Majority relies, this Court was called upon to determine "whether the authority granted to a school district under the Public School Code ... preempt[ed] the powers ... granted to a local zoning hearing board under the

Municipalities Planning Code. . . ." *Id.* at 1207. While each of those cases referenced the *Ogontz* test in resolving the governmental land use disputes at issue therein, unlike the present case, none of those cases involved an attempt to haul a Commonwealth agency before a city, township or borough, for an adjudication concerning any alleged violation of civil rights conferred by the municipality alone upon private individuals.

In *Ogontz*, the dispute concerned the City's denial of the agency's application for construction permits relative to building a proposed facility, where the proposed use thereof was not permitted by the applicable zoning ordinance, and the building as proposed was not in conformity with applicable sections of the Philadelphia Code. Part of the dispute, ultimately, was the issue of whether the City, specifically the City's zoning board, had jurisdiction over the Commonwealth agency. In resolving the dispute, the *Ogontz* Court observed that municipal corporations, such as the City, are subject to regulation by the state, having been created, governed, and having the extent of their powers determined by the General Assembly, generally subject to change, repeal or abolition at the will of the General Assembly. *Accord Robinson Township v. Commonwealth*, 83 A.3d 901, 977 (Pa.2013). In contrast, the Court observed that Commonwealth agencies derive their powers from their enabling statutes. Thus, the Court explained that the conflict at issue was that which "arises when a Commonwealth agency seeks to utilize real property in a manner that conflicts with a municipal corporation's zoning regulations," and that such a conflict "is not a contest between superior and inferior governmental entities, but instead a contest between two instrumentalities of the state." *Ogontz*, 483 A.2d at 452.

Within that context, the Court went on to explain:

The legislature has the power to regulate both of these governmental entities, enlarging or restricting their authority to act; and generally, the task of courts **in these cases** is to determine, through an examination of the enabling statutes applicable to each of the governmental entities, which

the legislature intended to have preeminent powers. The problem, essentially, is one of statutory interpretation.

*Id.* (emphasis added) (citing *Township of South Fayette v. Commonwealth,* 477 Pa. 574, 385 A.2d 344 (1978) (dispute concerning Commonwealth operation of treatment unit for delinquent juveniles in violation of township zoning ordinance); *City of Pittsburgh v. Commonwealth,* 468 Pa. 174, 360 A.2d 607 (1976) (dispute between municipality and Bureau of Corrections as to whether municipality's zoning authority preempted Bureau's authority to establish pre-release facilities); and *Pemberton Appeal,* 434 Pa. 249, 252 A.2d 597 (1969) (dispute between school district and township as to whether township could exclude schools from certain areas through zoning regulations)). The Court indicated that its allowance of appeal was occasioned, at least in part, by the fact that prior to *Ogontz,* this Court had yet to formulate "[a] general rule as to the precise circumstances under which a Commonwealth agency's land use determinations will prevail over the land use regulations of a local zoning board[.]" *Id.* Thus, this Court set out to establish such a general rule by looking to "these cases," *i.e.,* prior cases involving land use determinations by Commonwealth agencies that conflicted with those of local zoning boards. *See Twp. of South Fayette; City of Pittsburgh;* and *Pemberton Appeal.* Not surprisingly, this Court observed that: "The common thread running through these cases is the assertion that [w]hen there is an apparent conflict in the use of land use powers[,] we must look to the intent of the Legislature to determine which exercise of authority is to prevail." *Id.* at 453–54 (internal citation omitted).

The following statement by the Court is critical, I believe, to our determination as to whether the analysis in *Ogontz* is applicable to the instant matter:

When we approach this task . . . we are immediately faced with a paradox: determination of legislative intent as to priority of the two governmental entities is necessary to decide the case, **but that intent is indecipherable from the applicable statutes.** Having rejected balancing, and **being unable to determine legislative intent as to which agency**

**is to prevail,** we turn to the statutory construction rule that legislative intent **may** be determined by a consideration, *inter alia,* of the consequences of a particular interpretation. Statutory Construction Act, 1 Pa.C.S.A. § 1921(c)(6). The consequences of deciding that the Commonwealth should be preeminent in this matter are that Philadelphia's zoning scheme would be frustrated in this case and in every other case where a Commonwealth land use plan conflicted with the city plan.

*Id.* at 455 (emphasis added).

Ultimately, the Court concluded:

[D]eciding that the city's zoning authority supersedes that of the Commonwealth agency to establish a mental health facility in a particular geographical location arguably would give effect to the legislative mandates of both governmental entities, a consequence which, **absent more certain legislative direction,** seems advisable. Accordingly, we hold that DPW is subject to the jurisdiction of the Zoning Board and that in the case of a conflict between DPW's land use plans and the zoning use regulatory scheme of Philadelphia, the zoning scheme shall prevail. **We decline to infer a legislative intent that the Commonwealth agency has preemptive land use powers.** Of course, should the legislature determine that one or more Commonwealth agencies or projects should be empowered to supersede local land use regulations, it need only pass legislation to that effect.

*Id.* (emphasis added). *Ogontz* makes perfect sense given its land use context.

Consistently, and as the Majority concedes, in *County of Venango* and in *Hazleton Area School District,* this Court has indeed applied the general rule set forth in *Ogontz* to resolve apparent conflicts involving governmental land use powers. In *County of Venango,* the county sought to construct a new jail upon county owned land located within the Borough of Sugarcreek, and zoned as a residential area not permitting the proposed use. In *Hazleton Area School District,* the district sought to rent-out its athletic fields within Hazle Township for

baseball games when such use was not permitted by the Township's zoning ordinances. In each of those governmental land use cases, the *Ogontz* analysis was helpful and appropriate in resolving the land use conflicts between governmental entities. Contrary to the Majority's suggestion here, however, while we observed in *Hazleton* that the *Ogontz* Court "employed a two-step process for analyzing conflicting statutes[,]" *Hazleton Area School District,* 778 A.2d at 1210 (emphasis added), we did not hold that *Ogontz* sets forth **the** analytical process which every court must follow in resolving every conflict that arises between every governmental entity in order to determine legislative intent, and we certainly did not purport to mandate a legislative, or myopic, approach to be employed without regard to the context of the conflict at issue.

Respectfully, there is nothing in this Court's opinion in *Ogontz* indicating that the Court intended to stray from its adjudicative role and establish a quasi-legislative rule requiring a mandatory two-step process in the lower courts in every case involving disputes between Commonwealth agencies and municipalities whereby courts must first determine whether one entity holds preeminence over another, and then determine legislative intent as to which legislatively-created entity is to prevail exclusively by considering the consequences of proffered interpretations. In my view, when employed outside of its land use context, *Ogontz* at most stands for the general proposition that the General Assembly's intent is the controlling factor in conflicts respecting the exercise of statutory authority, and where such intent is not apparent on the face of the applicable statutes, that intent should be ascertained by turning to the Rules of Statutory Construction, which permit (but do not mandate) consideration of the consequences of competing interpretations. *See generally* 1 Pa.C.S. § 1921. Beyond that unremarkable general proposition, I believe that the analysis in *Ogontz* has its application only in the limited context of "the conflict that arises when a Commonwealth agency seeks to utilize real property in a manner that conflicts with a municipal corporation's zoning regulations," where the General Assembly's "intent is indecipherable

from the applicable statutes" and "absent more certain legislative direction," as the Court stated. *Ogontz, supra.* Such is clearly not the context of this case.

Here, there is no dispute concerning a Commonwealth agency's use of real property. Rather, this case is about whether SEPTA can be hauled before the City's Commission and held liable for conduct which allegedly violates the City's FPO, but which otherwise violates no provisions of law enacted by the Commonwealth or federal governments. This is also not a case of indecipherable legislative intent, or the absence of legislative direction. On the contrary, SEPTA's enabling statute explicitly provides:

> It is hereby declared to be the intent of the General Assembly that an authority created or existing under this chapter ... and the members, officers, officials and employees of any of them, **shall continue to enjoy sovereign and official immunity, as provided in 1 Pa.C.S. § 2310** (relating to sovereign immunity reaffirmed; specific waiver), **and shall remain immune from suit except as provided** by and subject to the provision of 42 Pa.C.S. §§ 8501 (relating to definitions) through 8528 (relating to limitations on damages).

Section 1711 of the Metropolitan Transportation Authorities Act (MTAA), 74 Pa.C.S. § 1711(c)(3) (emphasis added). Thus the General Assembly's intent that SEPTA be held immune from suit except as provided by the General Assembly is abundantly clear. *Goldman v. SEPTA,* 618 Pa. 501, 57 A.3d 1154, 1180 (2012) ("We agree with SEPTA that this language establishes that SEPTA has been statutorily classified by the legislature as an agency of the Commonwealth.") (citing *SEPTA v. Board of Revision of Taxes,* 574 Pa. 707, 833 A.2d 710, 716 (2003) ("SEPTA is part of the sovereignty of the Commonwealth and the property owned by SEPTA is presumed to be immune from taxation."); *Tulewicz v. SEPTA,* 529 Pa. 588, 606 A.2d 427, 430 (1992) ("SEPTA, by virtue of its enabling legislation, qualifies as a Commonwealth agency."); and *Feingold v. SEPTA,* 512 Pa. 567, 517 A.2d 1270, 1276–77 (1986) ("we have no hesitation in concluding that SEPTA was intend-

ed to be considered an agency of the Commonwealth.... Therefore, we conclude that it would be inappropriate to assess punitive damages against SEPTA given its status as a Commonwealth agency.")). Thus, although SEPTA is obviously not the Commonwealth, by express legislative direction SEPTA is protected from suit, even in administrative proceedings, by virtue of its creation and existence within, and coverage by, the sovereignty of the Commonwealth. *See, e.g., Frazier v. W.C.A.B. (Bayada Nurses, Inc.)*, 616 Pa. 592, 52 A.3d 241, 243 (2012) (holding employer's workers' compensation subrogation claim concerning settlement monies paid by SEPTA as Commonwealth party was barred pursuant to statute affirming sovereign immunity of political subdivisions); *see also Warrick v. Pro Cor Ambulance, Inc.*, 709 A.2d 422, 425 (Pa.Cmwlth.1997) ("[S]ection 1711(c)(3) of the Act shows the intent of the General Assembly to continue SEPTA's entitlement to sovereign immunity absent an exception"), *aff'd without opinion by Warrick v. Pro Cor Ambulance, Inc.*, 559 Pa. 44, 739 A.2d 127 (1999). Moreover, the General Assembly has provided no exception that would allow the City to subject SEPTA to civil rights ordinances adopted by political subdivisions imposing obligations over and above the General Assembly's state-wide civil rights provisions.

Notwithstanding the statutory language and significant body of caselaw confirming the immunity from suit that SEPTA holds in this Commonwealth absent applicable exception, the City's position is that SEPTA is subject to adjudication before the Commission under the City's FPO. In my view, the City plainly has overstepped its authority, and no newly clarified two-step process credited exclusively in the past to land use cases is necessary to reach that determination. Indeed, a review of *Ogontz* and its progeny, and review of the relied-upon statutory construction rules cited therein, all point to the same conclusion: where the intent of the General Assembly is clear from a plain reading of applicable statutes, there is no need for a statutory construction analysis considering the supposed consequences of proffered interpretations in order to ascertain and effectuate legislative intent. What is

required, simply stated, is application of the relevant statutory language as written.

In my view, the Commonwealth Court sufficiently accomplished that below, notably, by way of a 6–1 *en banc* decision that assessed legislative intent by not only looking to SEPTA's enabling legislation, but also to that of the Pennsylvania Human Relations Commission, to make two specific points which relate to legislative intent. First, referencing the Pennsylvania Human Relations Act, the court observed that the General Assembly granted jurisdiction over Commonwealth employers to the Pennsylvania Human Relations Commission for adjudication of matters concerning Commonwealth laws that prohibit discrimination. Then, referencing SEPTA's enabling legislation, the MTAA, the court observed the statutory language setting forth the General Assembly's declaration that SEPTA shall in no way be deemed an instrumentality of any municipality, and the legislative determination that SEPTA instead exists as an agency and instrumentality of the Commonwealth. The court concluded: "Clearly then, as an agency and instrumentality of the Commonwealth, SEPTA qualifies as an 'employer' for purposes of the [Human Relations] Act, subject to the jurisdiction of the [Pennsylvania Human Relations Commission]...." *SEPTA v. City of Philadelphia*, 20 A.3d 558, 561 (Pa.Cmwlth.2011). The court further stated:

> For purposes of discrimination cases covered under the [Human Relations] Act, SEPTA is a Commonwealth agency. As stated, the [Pennsylvania Human Relations Commission]'s enabling legislation clearly gives the [Pennsylvania Human Relations Commission], not the [Philadelphia] Commission, jurisdiction over SEPTA as an instrumentality of the Commonwealth in matters involving discrimination.

*Id.* at 562. In my view, this straightforward analysis is obviously correct. No remand to assess legislative intent is called for in this matter because the Commonwealth Court appropriately ascertained and effectuated the General Assembly's intent by looking to, and applying, the plain language of the relevant statutory provisions. As this Court demonstrated in *Board of Revision of Taxes*, the *Ogontz* analysis identified

by the Majority here is neither required, nor necessary; and the fact that the local legislation at issue strikes some as socially or politically progressive does not change the Court's interpretive duty.

In *Board of Revision of Taxes,* a case decided nearly twenty years after *Ogontz,* ten years after *County of Venango* and two years after *Hazleton Area School District,* this Court resolved the issue of whether property owned by SEPTA and leased to commercial tenants is immune from local taxation by the Board of Revision of Taxes of the City of Philadelphia, and did so without reference to the *Ogontz/Venango/Hazleton* test that the Majority now promotes as mandatory. The Court noted that as a general matter, property owned by a Commonwealth agency such as SEPTA is immune from local taxation absent express statutory authority to tax. The Court further explained:

> It cannot be presumed that general statutory provisions giving local subdivisions the power to tax local real estate, were meant to include property owned by the Commonwealth, since to allow such taxation would upset the orderly processes of government. Thus, in order to tax property owned by the Commonwealth, a local subdivision must establish that it has the authority to tax such property.

*Board of Revision of Taxes,* 833 A.2d at 713 (citation omitted). The Court further explained that absent such express statutory authority, property owned by SEPTA remains immune from local taxation so long as SEPTA's action with respect to the property is within SEPTA's legislatively authorized purposes and powers, and the actual use of the property is within the scope of SEPTA's immunity. Notably, *Board of Revision of Taxes* does not reference an *Ogontz/Venango/Hazleton* test. Nonetheless, the Majority here implausibly concludes that: "*Board of Revision of Taxes* is consistent with our application of the *Ogontz/Venango/Hazleton* test here[, as in] both instances, we have sought to enforce the legislature's allocation of authority." Maj. Op. at 485, 101 A.3d at 88. All cases are alignable if the test is that sort of meaningless generality. Notably, the Commonwealth Court's majority opinion below

likewise does not reference an *Ogontz/Venango/Hazleton* test; however; just like this Court in *Board of Revision of Taxes,* the court below obviously sought to enforce the General Assembly's intent by identifying and giving meaning to the plain wording of relevant statutes to reach the conclusion that the Commission simply does not have jurisdiction to impose and enforce the FPO against SEPTA. The fact that the Commonwealth Court did not employ the magic words— sovereign immunity—is of no consequence, as the court clearly recognized SEPTA's enabling statute and its existence as a Commonwealth Agency subject to jurisdiction for discrimination cases within the Commonwealth only as permitted by the General Assembly.

Although the Commonwealth Court correctly noted that nothing in the Human Relations Act grants the City authority to subject SEPTA to the City's FPO, the City insists that this fact is irrelevant because the source of the City's power to enact and enforce its FPO is its general home rule police power. That position obviously lacks merit. The City is not the Commonwealth sovereign, even within its borders. The fact remains that the General Assembly has provided that SEPTA exists within the sovereignty of the Commonwealth, thus remaining immune from liability, particularly visà-vis laws enacted under the authority of the Commonwealth, absent some exception established by the General Assembly.[1] Because the General Assembly has provided no exception that would allow the City to subject SEPTA to civil rights ordinances conferring rights which extend over and above the General Assembly's state-wide provisions, I would affirm the Commonwealth Court's decision rather than torture plain statutory language to achieve a desired result.

Justice EAKIN, concurring and dissenting.

I agree with the majority's holding that SEPTA was not required to exhaust administrative remedies prior to seeking declaratory and injunctive relief. However, I would hold it is

1. Vis-à-vis federal causes of action, we have observed that statutory enactment alone is insufficient to confer immunity upon Commonwealth agencies. *Goldman.*

not subject to the provisions of the Philadelphia Fair Practices Ordinance or the jurisdiction of the Philadelphia Commission on Human Relations, and I do not believe the appropriate way to resolve similar conflicts between state agencies and municipalities is through a test this Court developed, and utilized exclusively, for resolving competing interests in land use. Accordingly, I dissent as to that aspect of the majority opinion.

The majority contends "nothing in the *Ogontz* [ ] line of cases, or the reasoning behind those decisions, suggests that [the *Ogontz* ] analysis is restricted to conflicts over the applicability of zoning laws." Majority Op., at 483, 101 A.3d at 88. While *Ogontz*[1] and its progeny may not have expressly limited their application to zoning disputes, in each of those cases, the conflict centered on land-use powers. *See id.*, at 450; *see also Hazleton Area School District v. Zoning Hearing Board*, 566 Pa. 180, 778 A.2d 1205 (2001); *County of Venango v. Borough of Sugarcreek, Zoning Hearing Board*, 534 Pa. 1, 626 A.2d 489 (1993). To be sure, the test has been couched in broad terms by this Court and others. However, in the three decades following *Ogontz*, only one court in this Commonwealth appears to have actually applied the test outside the context of zoning. *See Saucon Valley School District v. Robert O.*, 785 A.2d 1069, 1076 (Pa.Cmwlth.2001).

In *Southeastern Pennsylvania Transportation Authority v. Board of Revision of Taxes*, 574 Pa. 707, 833 A.2d 710 (2003), we could have—and under the majority's expansive reading of the case, should have—invoked *Ogontz* to resolve whether property SEPTA leased to private businesses was subject to local property taxes, but we did not. Instead, we left *Ogontz* where it began: in the realm of zoning. While the majority claims *Board of Revision of Taxes* "is consistent with [its] application of the *Ogontz* [ ] test here" because "[i]n both instances, we have sought to enforce the legislature's allocation of authority[,]" Majority Op., at 485, 101 A.3d at 88, it fails to explain why *Ogontz* was not discussed, or even men-

1. *Department of General Services v. Ogontz Area Neighbors Association*, 505 Pa. 614, 483 A.2d 448 (1984).

tioned, in *Board of Revision of Taxes* if it was not limited to disputes over zoning ordinances.

Today, the majority creates the possibility that SEPTA, a multi-state transportation authority operating in over 100 municipalities across southeastern Pennsylvania, will be forced to ensure compliance with every anti-discrimination ordinance enacted by a municipality in which it operates. However, I believe, given the legislature's decision to confer upon SEPTA "the public powers of the Commonwealth as an agency and instrumentality thereof[,]" 74 Pa.C.S. § 1711(a), SEPTA's role in "performing essential governmental functions[,]"[2] and the absence of any indication local ordinances promulgated under the Pennsylvania Human Relations Act were meant to apply to the Commonwealth, we must assume the legislature intended to foreclose such an absurd result. Therefore, I see no need to extend the scope of the *Ogontz* test, and would instead affirm the judgment of the Commonwealth Court in full.

Justice SAYLOR, dissenting.

I differ with the majority's approach of remanding to the Commonwealth Court to ascertain legislative intent because, as I read the intermediate court's decision, it already undertook that task. *Accord* Concurring and Dissenting Opinion at 489–98, 101 A.3d at 95 (Castille, C.J.); *see, e.g., SEPTA v. City of Phila.*, 20 A.3d 558, 561–62 (Pa.Cmwlth.2011) (concluding that, under SEPTA's enabling legislation, SEPTA is a state agency and that, pursuant to the Pennsylvania Human Relations Act, the Pennsylvania Human Relations Commission was

**2.** In § 1781, when clarifying SEPTA would not be subject to taxation, the General Assembly provided:

> The effectuation of the authorized purposes of an authority created or continued under this chapter shall and will be in all respects for the benefit of the people of this Commonwealth, for the increase of their commerce and prosperity and for the improvements of their health and living conditions, and, since an authority will, as a public instrumentality of the Commonwealth, be performing essential governmental functions in effectuating such purposes, such an authority shall not be required to pay any taxes or assessments of any kind or nature whatsoever[.]

*Id.*, § 1781.

intended to have exclusive jurisdiction over state agencies like SEPTA). As to substance, I am aligned with Mr. Chief Justice Castille's position—and that of the Commonwealth Court majority—that the General Assembly did not intend for SEPTA to be subject to suit by the local human relations commissions of the municipalities in which it conducts operations. Accordingly, I respectfully dissent.