OPINION BY
Judge LEAVITT.
The Southeastern Pennsylvania Transportation Authority (SEPTA) seeks a declaratory judgment that as a Commonwealth agency it is not subject to the City of Philadelphia’s anti-discrimination ordinance, but only to the provisions of the Pennsylvania Human Relations Act.[1] The defendants, the City and the Philadelphia Commission on Human Relations (Philadelphia Commission), demurred to the complaint, and the Court of Common Pleas of Philadelphia County (trial court) sustained their preliminary objections. This Court reversed. The Supreme Court vacated our order and remanded the matter to this Court to do additional analysis. Concluding that the legislature did not intend SEPTA to be subject to a local anti-discrimination ordinance, we reverse.
Background
In 1963, the General Assembly established SEPTA pursuant to the Metropolitan Transportation Authorities Act, 74 Pa. C.S. §§ 1701-1785.[2] That Act provides:
There is hereby authorized the creation of a separate body corporate and politic in each metropolitan area, to be known as the transportation authority of that metropolitan area, extending to and including all of the territory in the metropolitan area.
74 Pa.C.S. § 1711(a). A “metropolitan area” is defined as “[a]ll of the territory within the boundaries of any county of the first class and all other counties located in whole or in part within 20 miles of the first class county.” 74 Pa.C.S. § 1701. Philadelphia is a “county of the first class.” Consistent with Section 1701, SEPTA operates a mass-transit system in Philadelphia and the four contiguous counties of Bucks, Chester, Delaware and Montgomery. As a transportation authority, SEP *1165 TA exercises the powers of a Commonwealth agency. Section 1711(a) further states:
An authority shall in no way be deemed to be an instrumentality of any city or county or other municipality or engaged in the performance of a municipal function, but shall exercise the public powers of the Commonwealth as an agency and instrumentality thereof.
74 Pa.C.S. § 1711(a) (emphasis added).
Philadelphia is a first class city that is governed under authority of the First Class City Home Rule Act.[3] Consistent with that authority, the City has established the Philadelphia Commission to administer and enforce the Philadelphia Fair Practices Ordinance,[4] which prohibits discrimination in the areas of employment, housing and public accommodations. The Fair Practices Ordinance forbids discrimination on the basis of race, ethnicity, color, sex, sexual orientation, gender identity, religion, national origin, ancestry, age, disability, marital status, familial status, genetic information, or domestic or sexual violence victim status. Phila. Code §§ 9— 1103, 9-1106.[5]
In 1955, the General Assembly enacted the Pennsylvania Human Relations Act, which forbids discrimination in the areas of employment, housing and public accommodations on the basis of “race, color, familial status, religious creed, ancestry, age, sex, national origin, handicap or disability, [or] use of guide or support animals because of the blindness, deafness or physical handicap of the user....” Section 2 of the Human Relations Act, 43 P.S. § 952. Its reach is statewide.
Both the Human Relations Act and the Fair Practices Ordinance forbid invidious discrimination. The protected classes in each legislation are nearly identical, but there are differences. The Fair Practices Ordinance forbids discrimination on the basis of a person’s sexual orientation and gender identity, genetic information or domestic violence status, and the Human Relations Act does not. On the other hand, the Human Relations Act protects those who use support animals by reason of their deafness and blindness; the Fair Practices Ordinance does not.
Facts and Procedural History
Between July 2007 and April 2009, the Philadelphia Commission initiated seven separate complaints and investigations against SEPTA for alleged discrimination against its employees or customers in vio *1166 lation of the Fair Practices Ordinance. Complaint, ¶ 14; Reproduced Record at 95a-96a (R.R. _).[6] Two of the complaints involved alleged discrimination on the basis of gender identity and sexual orientation.[7] Id.; R.R. 95a. SEPTA responded that as a Commonwealth agency, the Philadelphia Commission lacked jurisdiction over it. SEPTA requested the Philadelphia Commission dismiss each of the administrative complaints or certify them for an interlocutory appeal to address the jurisdiction issue. The Philadelphia Commission denied SEPTA’s requests.
On July 23, 2009, while the administrative complaints were pending, SEPTA filed the instant complaint against the City and the Philadelphia Commission (collectively, City).[8] SEPTA sought a declaration that the Fair Practices Ordinance does not apply to SEPTA because it is a Commonwealth agency. SEPTA also sought an injunction against the Philadelphia Commission’s exercise of jurisdiction over SEPTA.[9]
The City filed preliminary objections demurring to SEPTA’s complaint. On November 9, 2009, after briefing and argument, the trial court sustained the City’s preliminary objections and dismissed SEPTA’s complaint for the stated reason that SEPTA had failed to exhaust its administrative remedies and, further, was not exempt from the Fair Practices Ordinance. SEPTA appealed.
This Court, sitting en banc, reversed the trial court.[10] See Southeastern Pennsylva- *1167 nia Transportation Authority v. City of Philadelphia and Philadelphia Commission on Human Relations, 20 A.3d 558 (Pa.Cmwlth.2011). This Court concluded that SEPTA is a Commonwealth agency for purposes of discrimination claims and, as such, subject only to the Pennsylvania Human Relations Act. We stated:
[T]he PHRC’s [Pennsylvania Human Relations Commission] enabling legislation clearly gives the PHRC, not the [Philadelphia] Commission, jurisdiction over SEPTA as an' instrumentality of the Commonwealth in matters involving discrimination. Furthermore, there is no comparable grant of explicit jurisdiction to the [Philadelphia] Commission through its enabling ordinance, and any such grant would clearly conflict with the PHRC’s enabling statute.
Id. at 562. Because the Philadelphia Commission lacked jurisdiction over SEPTA, this Court held that the exhaustion of remedies doctrine did not preclude SEPTA’s pursuit of declaratory and injunctive relief. The Pennsylvania Supreme Court vacated this Court’s order and remanded for further proceedings. See Southeastern Pennsylvania Transportation Authority v. City of Philadelphia and Philadelphia Commission on Human Relations, — Pa. -, 101 A.3d 79 (2014) (SEPTA v. Philadelphia II). The Supreme Court agreed that SEPTA was not required to exhaust its administrative remedies before commencing its action, which presented a purely legal challenge. The Supreme Court also agreed that SEPTA is a Commonwealth agency.[11] However, it concluded that this Court failed to do the legislative intent analysis announced in Department of General Services v. Ogontz Area Neighbors Association, 505 Pa. 614, 483 A.2d 448 (1984), and used to determine when a state agency may be regulated by a local agency.[12] The Supreme Court stated as follows:
In conclusion, although the • Commonwealth Court correctly determined that SEPTA was not required in this instance to exhaust its administrative remedies before commencin'g this declaratory judgment action, it erred by not applying the Ogontz legislative intent analysis to determine whether SEPTA may properly be held to the provisions of the [Fair Practices Ordinance] and the jurisdiction of the Philadelphia Commission. We therefore vacate the Commonwealth Court’s order and remand the case to that court for it to conduct that analysis.
SEPTA v. Philadelphia II, 101 A.3d at 90-91. Accordingly, we do that analysis here.[13]
Ogontz Test
At issue in Ogontz was the Commonwealth’s proposed construction of a mental health facility in a Philadelphia neighbor *1168 hood that was zoned residential. The Philadelphia Zoning Board of Adjustment denied the Department of General Services’ permit application because the proposed use was not permitted in a residential district. The Department appealed, arguing that the Zoning Board could not impose any restrictions on the construction of a building authorized by a state statute. In considering that legal question, the Pennsylvania Supreme Court established the analysis to be used “[w]hen there is an apparent conflict in the use of ... powers” by two different governmental entities or agencies. Ogontz, 483 A.2d at 453-54 (quoting City of Pittsburgh v.- Commonwealth, 468 Pa. 174, 360 A.2d 607, 612 (1976)).
Noting that both government agencies were creatures of statute, the Supreme Court identified the Department’s preemption claim as one of statutory construction:
[T]he conflict that arises when a Commonwealth agency seeks to utilize real property in a manner that conflicts with a municipal corporation’s zoning regulations is not a contest between superior and inferior governmental entities, but instead a contest between two instru-mentalities of the state. The legislature has the power to regulate both of these governmental entities, enlarging or restricting their authority to act; and generally, the task of courts in these cases is to determine, through an examination of the enabling statutes applicable to each of the governmental entities, which the legislature intended to have preeminent powers. The problem, essentially, is one of statutory interpretation.
Ogontz, 483 A.2d at 452 (internal citation omitted) (emphasis added). The Supreme Court adopted a two-part test for resolving this statutory construction problem. First, a reviewing court must determine whether one legislative scheme was intended to have priority over the other. Second, where that priority cannot be discerned, the court must
turn to the statutory construction rule that legislative intent may be determined by a consideration, inter alia, of the consequences of a particular interpretation. Statutory Construction Act, 1 Pa.C.S.A. § 1921(c)(6).
Id. at 455.
Concluding that the statutes relevant to the proposed mental health facility did not provide a clear answer on priority, the Ogontz court considered the consequences of having the Department or the City prevail in the controversy. It concluded that upholding the zoning ordinance would not frustrate the Commonwealth’s ability to build mental health facilities. The Court reasoned as follows:
The consequences of deciding that the Commonwealth should be preeminent in this matter are that Philadelphia’s zoning scheme would be frustrated in this case and in every other case where a Commonwealth land use plan conflicted with the city plan. On the other hand, if the city were to prevail, the Commonwealth’s mandate to establish mental health facilities at various locations in the state would not necessarily be frustrated, for the loss of one location might well be compensated for by substitution of another. Thus, deciding that the city’s zoning authority supersedes that of the Commonwealth agency to establish a mental health facility in a particular geographical location arguably would give effect to the legislative mandates of both governmental entities, a consequence which, absent more certain legislative direction, seems advisable. Accordingly, we hold that [the Department] is subject to the jurisdiction of the Zoning Board and that in the case of a *1169 conflict between [the Department’s] land use plans and the zoning use regulatory scheme of Philadelphia, the zoning scheme shall prevail.
Id. (emphasis added).
Thus, Ogontz teaches that if there is a clear legislative directive as to which agency should be preeminent in a given situation, that directive controls. If there is no clear expression of legislative intent, courts must try to glean legislative intent in a way that gives effect to the mandates of both agencies, if possible. As instructed by the Supreme Court in its remand order, we consider the two-part test announced in Ogontz, beginning with whether the relevant statutes express a clear legislative directive on priority.
Legislative Priority
SEPTA argues that the applicable statutes demonstrate a legislative intent not to subject SEPTA to the Fair Practices Ordinance. This is because SEPTA’s enabling statute grants SEPTA immunity from suit, except where sovereign immunity has been expressly waived. The legislature has waived SEPTA’s sovereign immunity for discrimination under the Pennsylvania Human Relations Act but nowhere else, including in the First Class City Home Rule Act. SEPTA urges that because legislative intent is clear, there is no need to analyze the consequences of a particular statutory interpretation.
The City responds that SEPTA’s enabling act does not answer the question of legislative intent. If it did, there would have been no need for the Supreme Court to remand for this Court to perform an Ogontz analysis. The City argues that enforcement of its Fair Practices Ordinance does not conflict with SEPTA’s enabling act. The Pennsylvania Human Relations Act specifies that it was not intended to repeal or supersede a municipality’s anti-discrimination ordinance. The City believes this expresses the legislative intent that local municipalities may operate concurrently with the Pennsylvania Human Relations Commission, with overlapping jurisdiction.[14]
The Metropolitan Transportation Authorities Act, as noted supra, confirmed that SEPTA is a Commonwealth instrumentality and agency. Section 1711(a) states:
An authority shall in no way be deemed to be an instrumentality of any city or county or other municipality or engaged in the performance of a municipal function, but shall exercise the public powers of the Commonwealth as an agency and instrumentality thereof.
74 Pa.C.S. § 1711(a) (emphasis added). The Metropolitan Transportation Authorities Act also established that SEPTA enjoys sovereign immunity. Section 1711(c) states, in relevant part, as follows:
It is hereby declared to be the intent of the General Assembly that an authority created or existing under this chapter, including any authority established under the former provisions of Article II of the Pennsylvania Urban Mass Transportation Law or the former provisions of Chapter 15, and the members, officers, officials and employees of any of them, shall continue to enjoy sovereign and official immunity, as provided in 1 Pa. C.S. § 2310 (relating to sovereign immunity reaffirmed; specific waiver), and *1170 shall remain immune from suit except as provided by and subject to the provision of 42 Pa.C.S. §§ 8501 (relating to definitions) through 8528 (relating to limitations on damages).
74 Pa.C.S. § 1711(c)(3) (emphasis added). In turn, 1 Pa.C.S. § 2310 states:
Pursuant to section 11 of Article 1 of the Constitution of Pennsylvania, it is hereby declared to be the intent of the General Assembly that the Commonwealth, and its officials and employees acting within the scope of their duties, shall continue to enjoy sovereign immunity and official immunity and remain immune from suit except as the General Assembly shall specifically waive the immunity. When the General Assembly specifically waives sovereign immunity, a claim against the Commonwealth and its officials and employees shall be brought only in such manner and in such courts and in such cases as directed by the provisions of Title 42 (relating to judiciary and judicial procedure) or 62 (relating to procurement) unless otherwise specifically authorized by statute.
1 Pa.C.S. § 2310 (emphasis added). In short, suits against the Commonwealth are “permissible only where the legislature has expressly waived immunity.” Ebersole v. Southeastern Pennsylvania Transportation Authority, 111 A.3d 286, 289 (Pa. Cmwlth.2015) (emphasis added).
The Pennsylvania Human Relations Act prohibits discrimination in employment, housing and public accommodation by, inter alia, a person or employer. Pursuant to Section 4 of the Act, a “person” includes “the Commonwealth of Pennsylvania, and all political subdivisions, authorities, boards and commissions thereof,” 43 P.S. § 954(a), and an “employer” includes “the Commonwealth or any political subdivision or board, department, commission or school district thereof.” 43 P.S. § 954(b). It is beyond peradventure that SEPTA is subject to the Pennsylvania Human Relations Act.[15] Thus, the legislature has “specifically” waived SEPTA’s immunity from actions brought under the Pennsylvania Human Relations Act. 1 Pa.C.S. § 2310.
In order to make SEPTA also subject to the Fair Practices Ordinance, the legislature would have had to “specifically” waive SEPTA’s immunity from actions brought under local anti-discrimination ordinances. It did not do so.
The City relies upon the First Class City Home Rule Act as the basis for its authority to enforce the Fair Practices Ordinance against SEPTA. Our Supreme Court held that the Home Rule Act is not dispositive, explaining:
We consider the rule that a home-rule municipality’s exercise of legislative power is presumed valid, absent a specific constitutional or statutory limitation, to relate to a municipality’s authority to enact ordinances regarding a particular subject matter. That rule does not pertain to whether the municipality may enforce ordinances and regulations against a Commonwealth agency or instrumentality.
SEPTA v. Philadelphia II, 101 A.3d at 88. Simply, the Home Rule Act does not waive the immunity of Commonwealth agencies *1171 with the specificity required by 1 Pa.C.S. § 2310.
The City also argues that the General Assembly has not prohibited its application of the Fair Practices Ordinance to SEPTA or other Commonwealth agencies. Commonwealth agencies must abide by the City’s zoning and traffic ordinances. Likewise, it argues, they must abide by the City’s anti-discrimination ordinance.
This argument overlooks two important points. First, the anti-discrimination law is unlike zoning and traffic ordinances. Philadelphia alone regulates zoning and traffic control within the City. Therefore, if SEPTA were not subject to the City’s zoning and traffic ordinances, there would be a regulatory vacuum leaving SEPTA with carte blanche to do as it pleased in these important areas. This would produce an absurd result. On the other hand, the Fair Practices Ordinance is not the only anti-discrimination law applicable in Philadelphia. As discussed supra, SEPTA is subject to the Pennsylvania Human Relations Act, which prohibits SEPTA from discriminating against its employees and passengers. Second, the Fair Practices Ordinance authorizes private individuals to sue SEPTA for monetary damages, and SEPTA has been granted immunity from such damages.[16]
Section 1122 of the Fair Practices Ordinance authorizes a private right of action in the Philadelphia County Court of Common Pleas for damages. Phila. Code § 9-1122. The ordinance also authorizes the Philadelphia Commission to award compensatory damages, punitive damages, attorneys’ fees and payment of the Commission’s own expenses. Phila. Code §§ 9-1105, 9-1107.[17] In this re *1172 spect, the Fair Practices Ordinance veers far away from zoning and traffic ordinances, which are enforced only by the City. As this Court has explained, “[alb-sent a legislative abrogation of immunity, no party may seek to obtain relief against the Commonwealth.” New Foundations, Inc. v. Department of General Services, 893 A.2d 826, 830 (Pa.Cmwlth.2005). Sovereign immunity bars an action seeking to compel a state party to act or seeking monetary damages, except where the legislature has created an exception. Finn v. Rendell, 990 A.2d 100, 105 (Pa.Cmwlth. 2010). Further, punitive damages cannot be recovered from Commonwealth agencies. Feingold v. Southeastern Pennsylvania Transportation Authority, 512 Pa. 567, 517 A.2d 1270, 1276-77 (1986). The penalties authorized by the Fair Practices Ordinance require an express waiver of sovereign immunity, and none has been expressed by the General Assembly.
The City argues, nevertheless, that the Pennsylvania Human Relations Act expresses a waiver of sovereign immunity because it specifies that it does not repeal or supersede any municipal anti-discrimination ordinance. Section 12 of the Penn-sylvania Human Relations Act states, in relevant part, as follows:
(a) The provisions of this act shall be construed liberally for the accomplishment of the purposes thereof, and any law inconsistent with any provisions hereof shall not apply. (b) Except as provided in subsection (c), nothing contained in this act shall be deemed to repeal or supersede any of the provisions of any existing or hereafter adopted municipal ordinance, municipal charter or of any law of this Commonwealth relating to discrimination because of race, color, familial status, religious creed, ancestry, age, sex, national origin or handicap or disability[.] ... In the event of a conflict between the interpretation of a provision of this act and the interpretation of a similar provision contained in any municipal ordinance, the interpretation of the provision in this act shall apply to such municipal ordinance.
43 P.S. § 962(a), (b).[18] The City contends that Section 12 means, specifically, that the Fair Practices Ordinance can be enforced against SEPTA.
We disagree. The legislature has waived SEPTA’s immunity from suit arising from discrimination by making it subject to the jurisdiction of the Pennsylvania Human Relations Commission. Exceptions to sovereign immunity are to be narrowly construed.[19] Dean v. Department of *1173 Transportation, 561 Pa. 508, 751 A.2d 1130, 1134 (2000). Section 12(b) of the Pennsylvania Human Relations Act does not express an intent to subject SEPTA, or any Commonwealth agency, to the Fair Practices Ordinance.[20]
In sum, it is apparent from the language of the applicable statutes that the legislature did not intend to subject SEPTA to the Fair Practices Ordinance. Therefore, we need proceed no further in our legislative intent analysis. Nevertheless, for the sake of completeness, we will address the second prong of the Ogontz test.
Consideration of Consequences
The second prong of the Ogontz test discerns legislative intent by considering, inter alia, the consequences of a particular interpretation. SEPTA argues that to • subject it to the Fair Practices Ordinance would add another layer of regulation in addition to that provided in federal and state civil rights laws.[21] This would cause confusion because, inter alia, its service area extends beyond Philadelphia. SEPTA. will expend scarce resources on a daunting legal investigation of what it can do and where it can do it, and not on its central mission of providing public transportation services.
On the other hand, finding in favor of SEPTA will protect the public fisc, a vital consideration. Exempting SEPTA from the Fair Practices Ordinance still leaves SEPTA subject to the Pennsylvania Human Relations Act. SEPTA cannot engage in invidious discrimination at will and does not wish to do so. It is up to the General Assembly, not the City, to amend the Pennsylvania Human Relations Act to enlarge the categories of citizens protected from invidious discrimination. The Fair Practices Ordinance expressly excludes religious employers and the United States government from its terms. Excluding Commonwealth agencies from its reach is consistent with the policy to exclude federal agencies.[22]
*1174 The City responds that the consequences of applying the Fair Practices Ordinance to SEPTA weigh strongly in favor of coverage. If SEPTA can comply with the City’s traffic ordinances, it can comply with the Fair Practices Ordinance. Further, forbearing from acts of discrimination will not adversely affect SEPTA’s core mission of providing efficient transportation; to the contrary, non-discrimination should be part of SEPTA’s central mission. SEPTA’s concerns about confusing multi-jurisdictional regulation is addressed by compliance with the strictest anti-discrimination laws, ie., the Fair Practices Ordinance.[23] It is irrelevant that applying the Fair Practices Ordinance to SEPTA may have significance to other Commonwealth agencies. It is not clear that it would because the Ogontz analysis could vary depending on the facts of a case. Finally, the City contends that it is irrelevant that the City has excluded some employers from the Fair Practices Ordinance’s coverage. The relevant question is whether an Ogontz analysis favors application of the Fair Practices Ordinance to SEPTA, an entity headquartered in Philadelphia that employs 9,000 people and provides transportation to a large percentage of the City’s population.
We agree that the focus is on SEPTA in this prong of the Ogontz analysis and not on other persons the City has exempted from the Fair Practices Ordinance. However, we conclude that a consideration of the consequences of subjecting SEPTA to the Fair Practices Ordinance leads to the conclusion that the legislature did not intend this result.
SEPTA operates in Philadelphia, but also in Bucks, Chester, Delaware and Montgomery Counties. Each county contains numerous municipalities.[24] “[A]ll municipalities have the authority to enact anti-discrimination laws pursuant to their police powers.” Building Owners and Managers Association of Pittsburgh v. City of Pittsburgh, 603 Pa. 506, 985 A.2d 711, 715 n. 12 (2009). This means that if SEPTA is subject to the provisions of the Fair Practices Ordinance, it would also be subject to anti-discrimination legislation-enacted by any of the over 100 municipalities through which it operates its various bus, train and trolley routes. The compliance problems are myriad. Were SEPTA subject to the anti-discrimination ordinances of each municipality, its legal obligations would change in the course of a single bus trip. Compliance would require learning the content of every municipali *1175 ty’s ordinance as well as constant monitoring of each ordinance to remain current, and training all employees accordingly. The City contends that SEPTA simply needs to comply with the City’s ordinance, which it claims to be the strictest. Nevertheless, any of the 100 municipalities may adopt an ordinance stricter than the City’s at any time.
SEPTA receives its funding from state and federal sources, and to a much lesser extent, local sources in the areas it serves. A primary purpose of sovereign immunity is “protection of the public fisc.” Frazier v. Workers’ Compensation Appeal Board (Bayada Nurses, Inc.), 616 Pa. 592, 52 A.3d 241, 250 (2012). Spending these funds to ensure compliance with any potential number of different local anti-discrimination statutes would divert them away from SEPTA’s core mission of providing public transportation.
Simply put, subjecting SEPTA to loeal anti-discrimination laws could prove overwhelming. Courts must presume that the legislature did not intend a result that is unreasonable or absurd where the legislature’s intent is not clear. 1 . Pa.C.S. § 1922(1). Thus, even if the intent of the legislature were not apparent from the language of the applicable statutes, we would conclude that the consequences of finding in SEPTA’s favor are far less problematic than a ruling that SEPTA is subject to the Fair Practices Ordinance. SEPTA is still subject-to federal and state anti-discrimination statutes.
Conclusion
In sum, we conclude that the legislature did not intend for SEPTA to be subject to the Philadelphia Fair Practices Ordinance
or the jurisdiction of the Philadelphia Commission.
Accordingly, the order of the trial court sustaining the preliminary objections of the City and Philadelphia Commission is reversed. The matter is remanded for further proceedings consistent with this opinion.

ORDER

AND NOW, this 7th day of August, 2015, the order of the Court of Common Pleas of Philadelphia County sustaining the preliminary objections filed by the City of Philadelphia and the Philadelphia Commission on Human Relations in the above-captioned matter is hereby REVERSED. The matter is REMANDED for further proceedings consistent with the foregoing opinion.
Jurisdiction relinquished.

. Act of October 27, 1955, P.L. 744, as amended, 43 P.S. §§ 951-963.

. The original Metropolitan Transportation Authorities Act of 1963, Act of August 14, 1963, P.L. 984, No. 450, has been replaced by the current Metropolitan Transportation Authorities Act, 74 Pa. C.S. §§ 1701-1785. All transportation authorities are deemed to have been created under the current act. 74 Pa. C.S. § 1711(c)(1).

. Act of April 21, 1949, P.L. 665, as amended, 53 P.S. §§ 13101-13157.

. The Fair Practices Ordinance is codified at Sections 9-1101 through 9-1129 of The Philadelphia Code.

. Sections 1103 and 1106 of the Fair Practices Ordinance state, in relevant part, as follows:
§ 9-1103 Unlawful Employment Practices.
(1) It shall be an unlawful employment practice to deny or interfere with the employment opportunities of an individual based upon his or her race, ethnicity, color, sex, sexual orientation, gender identity, religion, national origin, ancestry, age, disability, marital status, familial status, genetic information, or domestic or sexual violence victim status.
Phila. Code § 9-1103.
§ 9-1106 Unlawful Public Accommodations Practices.
(1) It shall be an unlawful public accommodations practice to deny or interfere with the public accommodations opportunities of an individual or otherwise discriminate based on his or her race, ethnicity, color, sex, sexual orientation, gender identity, religion, national origin, ancestry, disability, marital status, familial status, or domestic or sexual violence victim status.
Phila Code § 9-1106.

. Three complaints alleged discrimination on the basis of disability, one alleged religious discrimination, one alleged gender discrimination, one alleged sexual orientation discrimination and one alleged gender identity discrimination. Complaint, ¶ 14; R.R. 95 a-96a. All but two complaints involve alleged conduct expressly prohibited by the Human Relations Act. SEPTA’s complaint lists only the name of the complainants, the date the complaints were filed and the type of discrimination being alleged. The record contains no more specific information such as whether each complainant was a SEPTA employee or customer, or the details of the alleged incidents.

. The complaint based on gender identity was brought by an individual that identifies as female and purchased a bus pass listing her gender as female; however, the surgery has not yet taken place. Bus passes cannot be shared or transferred to another passenger. The bus driver questioned the proffered pass saying, "You don’t look like a female. Are you a male?” Faced with the bus driver’s opposition to using the bus pass, the passenger paid the cash- fare to ride the bus. Paul Nussbaum, City to probe transit rider's gender ID complaint, Philadelphia Inquirer, September 20, 2008. http://articles.phiIly.com/2008-09-20/news/24991546_1_septa-gender-cash-fare (last visited 8/5/2015).

. The seven complaints against SEPTA have not yet been resolved by the Philadelphia Commission. City’s Brief at 7.

. The next day, SEPTA filed a motion for preliminary injunction. The trial court granted the preliminary injunction on the grounds that the City failed to file a timely answer. The City filed a motion for reconsideration. The trial court granted the City's motion and . vacated the preliminary injunction. The trial court has not issued an order on the reconsideration of SEPTA’s motion for preliminary injunction.

. When an appellate court considers whether preliminary objections in the nature of a demurrer were properly sustained, the standard of review is de novo and the scope of review is plenary. Mazur v. Trinity Area School District, 599 Pa. 232, 961 A.2d 96, 101 (2008). A demurrer is properly sustained only if, based on the facts pleaded, it is clear and free from doubt that no recovery is possible. Id. If any doubt exists, it should be resolved in favor of overruling the demurrer. Cornelius v. Roberts, 71 A.3d 345, 347 n. 2 (Pa.Cmwlth.2013). The court must accept as true all well-pleaded, material and relevant facts alleged in the complaint and every inference that is fairly deducible from those facts. Id.

. The Supreme Court stated that "SEPTA has mistaken our insistence that courts seek out and effectuate the intent of the legislature for a requirement that the legislature state its intent clearly or explicitly that a municipality is to have ‘preeminent powers’ over a state agency in a given area of law.” SEPTA v. Philadelphia II, 101 A.3d at 87.

. This case involves an issue of statutory interpretation, which is a pure question of law. Philomeno & Salamone v. Board of Supervisors of Upper Merion Township, 600 Pa. 407, 966 A.2d 1109, 1111 (2009). Questions of law are subject to de novo review, and our scope of review is plenary. Id.

. Three Justices authored dissents, with two of them opining that this Court had already performed the legislative intent analysis.

. The American Civil Liberties Union of Pennsylvania and the Mazzoni Center, a self-described provider of health care services to Philadelphia’s lesbian, gay, bisexual and transgender communities, have filed an amici curiae brief taking the position that SEPTA is subject to the Fair Practices Ordinance.

. The City argues that SEPTA should not be treated as the Commonwealth for purposes of the Pennsylvania Human Relations Act, noting that the Court's prior ruling in this case was vacated by the Supreme Court in SEPTA v. Philadelphia II, 101 A.3d 79. The Supreme Court did not hold that SEPTA should not be treated as the Commonwealth for purposes of the Pennsylvania Human Relations Act. To the contrary, the Supreme Court agreed that SEPTA is a Commonwealth agency pursuant to its enabling act for purposes of this case. Id. at 87 (referring to SEPTA as a "state agency.”).

. Indeed, as observed by the amici curiae, "[fjor those SEPTA employees or riders who identify as lesbian, gay, bisexual or transgender, their ability to pursue claims before the local Human Relations Commissions is literally the difference between having their 'day in court’ and having no legal recourse at all." Amici Curiae Brief at 4.

. Sections 1105 and 1107 of the Fair Practices Ordinance state as follows:
§ 9-1105 Remedies for Unlawful Employment Practices.
(1) In addition to the relief authorized by § 9-1121 (relating to penalties), the Commission may issue an order directing a respondent who has engaged in an unlawful employment practice to take affirmative action to redress the harms suffered by the complainant. The Commission may order remedies, including, but not limited to: ■
(a) An order requiring the respondent to cease and desist such unlawful practice;
(b) Any injunctive or other equitable relief, including:
(.1) hiring, reinstating or upgrading, with or without back pay;
(.2) admitting or restoring membership in a labor organization;
(.3) admission to a guidance, apprentice-training or retraining program;
(c) Payment of compensatory damages;
(d) Payment of punitive damages, not to exceed $2,000 per violation;
(e) Payment of reasonable attorneys’ fees;
(f) Payment of hearing costs as reimbursement for expenses incurred by the Commission.
Phila. Code § 9-1105.
§ 9-1107 Remedies for Unlawful Public Accommodations Practices.
(1) In addition to the relief authorized by § 9-1121 (relating to penalties), the Commission may issue an order directing a respondent who has engaged in an unlawful public accommodations practice to take affirmative action to redress the harms suffered by the complainant. The Commission may order remedies, including, but not limited to:
(a) An order requiring the respondent to cease and desist such unlawful practice;
(b) Any injunctive or other equitable relief, including extending full, equal, unsegregated public accommodations, advantages and facilities;
(c) Payment of compensatory damages;
(d) Payment of punitive damages, not to exceed $2,000 per violation;
*1172 (e) Payment of reasonable attorneys’ fees;
(f) Payment of hearing costs as reimbursement for expenses incurred by the Commission.
Phila. Code § 9-1107.

. Section 12.1 of the Pennsylvania Human Relations Act authorizes the creation of local human relations commissions and specifies that:
(d) The legislative bodies of political subdivisions shall have the authority to grant to local commissions powers and duties similar to those now exercised by the Pennsylvania Human Relations Commission under the provisions of this act.
(e) The local human relations commission shall notify the Pennsylvania Human Relations Commission of complaints received involving discriminatory acts within that commission’s jurisdiction.
43 P.S. § 962.1. Section 12.1 was added by the Act of January 24, 1966, P.L.(1965) 1523.

. See 1 Pa.C.S. § 2310 ("the Commonwealth ... shall continue to enjoy sovereign immunity ... and remain immune from suit except as the General Assembly shall specifically waive the immunity.... A claim against the Commonwealth ... shall be brought only in such manner and in such courts and in such cases as ... specifically authorized by statute.”).

.In his dissent, President Judge Pellegrini posits that the Pennsylvania Human Relations Act gives Philadelphia authority over SEPTA in anti-discrimination matters. Section 12.1(d) allows local commissions to have "powers and duties similar to those now exercised by the Pennsylvania Human Relations Commission.” 43 P.S. § 962.1(d) (emphasis added). “Similar” does not mean "identical." Accordingly, this language does not expressly confer jurisdiction in local commissions to supervise Commonwealth agencies. Section 12.1(d) does not mean that local commissions have jurisdiction over SEPTA. Section 12(b) of the Human Relations Act specifies that it did not repeal or supersede any municipal law- prohibiting discrimination because of "race, color, familial status, religious creed, ancestry, age, sex, national origin or handicap or disability!)]” 43 P.S. § 962(b). Municipalities do have the power to define discrimination in ways that differ from the definition in the Human Relations Act. Hartman v. City of Allentown, 880 A.2d 737 (Pa. Cmwlth.2005). However, the source of the power to do so is the police power under the municipality's enabling act, not the Human Relations Act. Section 12(b)’s savings clause is silent as to the municipality’s authority over state agencies and, thus, does not confer power on the City to enforce the Fair Practices Ordinance against state agencies.

. It is undisputed that SEPTA is subject to the jurisdiction of the Pennsylvania Human Relations Commission and the United States Equal Employment Opportunity Commission. SEPTA is also subject to Title VI of the Civil Rights Act of 1964, which prohibits discrimination on the basis of "race, color or national origin" when providing public transportation, 42 U.S.C. § 2000d, and Title VII which prohibits employment discrimination on the basis of “race, color, religion, sex or national origin.” 42 U.S.C. § 2000e-2.

. SEPTA argues that a remand is needed for the development of a record regarding the consequences of subjecting SEPTA to the Fair Practices Ordinance. Judge Simpson's dissent agrees with this point. The City argues that a record is unnecessary. The task of *1174 statutory construction includes consideration of the "consequences of a particular interpretation,” 1 Pa.C.S. § 1921, and the "proper construction of a statute is resolvable by a court as a matter of law.” Allegheny County Sportsmen's League v. Rendell, 580 Pa. 149, 860 A.2d 10, 24 (2004). Thus, the Ogontz consideration of the consequences of a particular statutory interpretation is a legal, not a factual, question that does not require evidence. Consequences can be posited by the Court.
Ogontz did not cite facts in its consequences analysis. The only case where the Ogontz test was applied outside the context of land use is Saucon Valley School District v. Robert, 785 A.2d 1069 (Pa.Cmwlth.2001). In Saucon, this Court posited the consequences without reference to record evidence.

. The Fair Practices Ordinance and the Pennsylvania Human Relations Act define protected classes differently. The language differences may, or may not, have significance. Both proscribe sex discrimination, which is a flexible concept.

. There are 54 municipalities in Bucks County, 73 in Chester County, 49 in Delaware County and 62 in Montgomery County. See also SEPTA v. Philadelphia II, 101 A.3d at 97 (Eakin, J., concurring and dissenting) (explaining that SEPTA operates "in over 100 municipalities across southeastern Pennsylvania.”).