[J-87-2016] [OAJC: Mundy, J.]

# IN THE SUPREME COURT OF PENNSYLVANIA
## EASTERN DISTRICT

| | | |
|---|---|---|
| SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY, | : | No. 10 EAP 2016 |
| | : | |
| | : | Appeal from the Order of the |
| Appellee | : | Commonwealth Court at No. 2445 CD |
| | : | 2009 filed 8/7/2015 reversing and |
| | : | remanding the Order, dated 11/10/2009 |
| v. | : | in the Court of Common Pleas, |
| | : | Philadelphia County, Civil Division at |
| | : | No. 03055, July Term, 2009. |
| CITY OF PHILADELPHIA AND | : | |
| PHILADELPHIA COMMISSION ON | : | ARGUED: September 13, 2016 |
| HUMAN RELATIONS, | : | |
| | : | |
| Appellants | : | |

## CONCURRING OPINION

**JUSTICE WECHT**                                          **DECIDED: April 26, 2017**

I concur in the result reached by the learned opinion announcing the judgment of the Court ("OAJC"). I write separately to endorse an alternative application of the *Ogontz* test. *See Commonwealth, Dep't of Gen. Servs. v. Ogontz Area Neighbors Ass'n*, 483 A.2d 448 (Pa. 1984) ("*Ogontz*").

In *SEPTA v. City of Philadelphia*, 101 A.3d 79, 88 (Pa. 2014) ("*SEPTA III*"), this Court recognized that, where a Commonwealth agency challenges a municipality's exercise of authority, the *Ogontz* test applies to resolve the conflict between the two instrumentalities of the state. *See Ogontz*, 483 A.2d at 452 (holding that conflict between Commonwealth agency and municipality is "not a contest between superior and inferior government entities, but instead a contest between two instrumentalities of the state."). We have explained the test as follows:

> The first step requires the reviewing court to determine, through examination of the statutes, which governmental entity, if any, the General Assembly expressly intended to be preeminent . . . . In the event there is no such express legislative mandate, the second step requires the court "to determine legislative intent as to which agency is to prevail . . . turn[ing] to the statutory construction rule that legislative intent may be determined by a consideration, *inter alia*, of the consequences of a particular interpretation."

*Hazleton Area Sch. Dist. v. Zoning Hearing Bd.*, 778 A.2d 1205, 1210 (Pa. 2001) (quoting *Ogontz*, 483 A.2d at 455) (citations omitted). This two-part test embraces the process of statutory construction, with which this Court is deeply familiar. We look first to the legislation's plain language. If that language is ambiguous, we apply other principles embodied in our rules of statutory construction, which include a consideration of "[t]he consequences of a particular interpretation." 1 Pa.C.S. § 1921.

In my view, the first prong of the *Ogontz* test requires the Court to look to the language of the enabling statutes of both SEPTA and the City of Philadelphia in order to determine only whether the General Assembly included in either statute an express statement that one entity or the other has priority in the event of a conflict. In this case, we would review the Metropolitan Transportation Authorities Act ("MTAA"), 74 Pa.C.S. §§ 1701-85, and the First Class City Home Rule Act ("Home Rule Act"), 53 P.S. §§ 13101-157, for a statement such as "SEPTA is exempt from local regulations," or "Philadelphia may exercise jurisdiction over entities created by an act of the Commonwealth." Because the statutes offer no such language, the first prong of the Ogontz test is inconclusive.

I respectfully disagree with the OAJC's conclusion that the sovereign immunity provision contained in the MTAA, 74 Pa.C.S. § 1711(c)(3), represents an explicit statement that SEPTA has priority over Philadelphia in the area of anti-discrimination legislation under the first prong of *Ogontz*. The OAJC agrees that "neither enabling statute contain[s] an explicit provision directly addressing the issue," but concludes that

the lack of an express directive, "[does] not preclude the possibility that an examination of the statutes as a whole [can] reveal such a clear intent." Maj. Op. at 14.[1] I believe that the comparative assessment of the statutory scheme "as a whole" should occur at the second stage of the analysis. Otherwise, the inclusion of a sovereign immunity provision in an entity's enabling statute would always give the entity priority over a local authority as to any type of local regulation, an outcome this Court expressly rejected in *SEPTA III*. 101 A.3d at 89 n.13 ("[W]hen presented with two competing absolutes—here sovereign immunity and the authority of Philadelphia to enforce its ordinance, we employ the tools of statutory construction and interpretation to resolve the conflict."). As explained in greater detail below, I believe that SEPTA's priority in this particular scenario stems from the fact that the local regulation in question, the Philadelphia Fair Practices Ordinance ("FPO"), directly undermines the General Assembly's intention to shield SEPTA from the hazards of litigation.

The second *Ogontz* prong requires the Court to assess the consequences of each party's proffered interpretation of the statutes. Although particular circumstances may require the development of a factual record in order to apply the second prong, this is not necessary in every case. For instance, in *Ogontz* itself, this Court considered the consequences of allowing the Commonwealth to build a mental health facility on Commonwealth property in contravention of a local zoning ordinance. The Court concluded as a matter of law that allowing the facility to be built in the proposed location, a residential zone, would frustrate the purpose of the local law, while upholding

---

[1] The OAJC explains that the first step in the *Ogontz* analysis "requires an examination of the overall language of the legislation to discern if the General Assembly expressly intended one [entity] or the other to be preeminent." Maj. Op. at 14. The OAJC's review of the legislation's "overall language" under the first prong of *Ogontz* could be interpreted as an attempt to ascertain the implied intent of the General Assembly rather than its expressed intent, as the first step of *Ogontz* requires.

the zoning ordinance would not prohibit the Commonwealth from constructing the facility elsewhere. The Court did not need a developed factual record to assess these consequences and to reach the conclusion that enforcing the zoning ordinance caused less disruption to each statutory scheme.

Likewise, in the present case, we can apply the second prong of *Ogontz* without remanding the case for fact-finding. We can evaluate the purely legal consequences of each party's suggested interpretation of the MTAA and the Home Rule Act, which includes an appraisal of their overall statutory schemes. With regard to Philadelphia's argument that SEPTA's core transportation function will not be upset by requiring it to comply with the FPO, we need not consider how much it will cost SEPTA to comply with the ordinance and to defend itself from claims of discrimination. Rather, we can look to the MTAA's provisions and ascertain the extent to which those provisions would be upset by subjecting SEPTA to the FPO. Similarly, we can consider the effect that exempting SEPTA from the FPO will have on Philadelphia's Home Rule authority and the efficacy of the FPO.

By including Subsection 1711(c)(3) in the MTAA,[2] the General Assembly expressed its will to shield SEPTA from most types of lawsuits, absent a specific waiver,

---

[2]     Subsection 1711(c)(3) provides as follows:

It is hereby declared to be the intent of the General Assembly that an authority created or existing under this chapter, including any authority established under the former provisions of Article II2 of the Pennsylvania Urban Mass Transportation Law or the former provisions of Chapter 15, and the members, officers, officials and employees of any of them, shall continue to enjoy sovereign and official immunity, as provided in 1 Pa.C.S. § 2310 (relating to sovereign immunity reaffirmed; specific waiver), and shall remain immune from suit except as provided by and subject to the provision of 42 Pa.C.S. §§ 8501 (relating to definitions) through 8528 (relating to limitations on damages).

74 Pa.C.S. § 1711(c)(3)

ostensibly so that SEPTA could provide public transportation without enduring the financial and temporal costs of litigation. *See Sci. Games Int'l, Inc., v. Commonwealth,* 66 A.3d 740, 755 (Pa. 2013) ("The constitutionally-grounded, statutory doctrine of sovereign immunity obviously serves to protect government policymaking prerogatives and the public fisc."); *Mullin v. Commonwealth, Dep't of Transp.*, 870 A.2d 773, 779 (Pa. 2005) ("[I]mmunity provisions were enacted to insulate the Commonwealth and its agencies from liability except in certain specified circumstances, so that state governmental revenues are not subject to unnecessary depletion.") (citation omitted); *Stackhouse v. Commonwealth, Pa. State Police*, 892 A.2d 54, 62 (Pa. Cmwlth. 2006) ("The purpose of absolute sovereign immunity [is] to insulate state agencies and employees not only from judgments but also from being required to expend the time and funds necessary to defend suits."). Were we to interpret the FPO to apply to SEPTA with full force, we would frustrate the General Assembly's intent that SEPTA be subject to only certain types of litigation, inasmuch as the FPO provides for an individual private right of action accompanied by damage awards. *See* Phila. Code § 9-1122.

Conceding that the MTAA's sovereign immunity provision bars individuals from bringing private suits against SEPTA, Philadelphia claims that it nonetheless may selectively enforce the FPO against SEPTA by seeking only injunctive and collaborative remedies. However, even such selective enforcement involves administrative investigations and hearings, which may result in cease and desist orders, injunctive relief, attorneys' fees, and costs for expenses incurred by the Philadelphia Commission on Human Relations ("the Commission"). *See* Phila. Code § 9-1107. The FPO also establishes criminal penalties for non-compliance with orders of the Commission. Phila. Code § 9-1121(1)-(2). Although these latter proceedings and remedial orders may not

result from a lawsuit or implicate damage awards,[3] they nonetheless present the burdens associated with litigation that the General Assembly sought to preclude by granting SEPTA sovereign immunity.[4]  The inclusion of a sovereign immunity provision in SEPTA's enabling statute, in the absence of any other relevant statutory language, evinces the legislative will to minimize SEPTA's litigation-related burden.  The question presented in this case is whether the General Assembly intended that Philadelphia exercise authority over SEPTA in the manner prescribed by the FPO.  Selective enforcement or severability of the FPO is impossible because the General Assembly has either given Philadelphia such authority or it has not.

Even if Philadelphia's enforcement of the FPO was limited to prohibitory injunctive relief, Philadelphia nonetheless constructively could usurp SEPTA's authority over its core transportation mission and burden SEPTA substantially.  For example, SEPTA might plan to change its routing to severely diminish services to a particular neighborhood with an unusually high concentration of riders protected by the FPO but not protected by the Pennsylvania Human Relations Act ("PHRA").  Absent some legal bar, Philadelphia then could seek a prohibitory injunction alleging discrimination based upon the disparate provision of services.  Under the FPO, Philadelphia, if it prevailed,

---

[3]    Such proceedings may fall outside the scope of sovereign immunity. *See Wilkinsburg Police Officers Ass'n v. Commonwealth*, 636 A.2d 134, 137 (Pa. 1993) ("[S]uits which simply seek to restrain state officials from performing affirmative acts are not within the rule of immunity.").

[4]    *Cf.* Dissenting Op. at 8 ("SEPTA is obliged to participate in these processes including attendance at mediations and conciliations in furtherance of the relief sought, and compliance with investigative subpoenas . . . .").  I do not suggest that sovereign immunity extends beyond suits for damages, recovery of property, or mandatory injunctive relief.  I do conclude, based upon the General Assembly's express will that SEPTA not be subjected to litigation—as evinced by the inclusion of Subsection 1711(c)(3)—that exempting SEPTA from the FPO is more consistent with the General Assembly's intent than subjecting SEPTA to the FPO.

could obtain an injunction preventing SEPTA from rerouting or rescheduling certain buses or trains away from that neighborhood, effectively telling SEPTA how to fulfill its mandate.[5] Thus, subjecting SEPTA to the FPO would undermine the MTAA. The MTAA, and particularly its sovereign immunity provision, evinces the General Assembly's intent to allow SEPTA to avoid litigation, an intent that would be frustrated if SEPTA is subjected to the jurisdiction of the Commission under the FPO.[6]

The learned Dissent maintains that the PHRA reveals some policy on the part of the General Assembly to disfavor all types of discriminatory conduct, not just those enumerated in that statute, and that "SEPTA's core mission is to provide public transportation without engaging in discriminatory conduct." Dissenting Op. at 9 (emphasis removed). The Dissent goes on to argue that SEPTA impliedly is prohibited

---

[5] The Dissent notes that an order to correct existing underservice would require a mandatory injunction, which clearly would be defeated by SEPTA's sovereign immunity. Dissenting Op. at 10 n.6. By contrast, the remedy hypothesized above describes a prohibitory injunction issued to prevent a diminution in service, a remedy that falls outside the realm of sovereign immunity but that necessarily impinges upon SEPTA's ability to make transportation-related decisions. The same can be said of other FPO remedies such as conciliation agreements or cease-and-desist orders.

[6] The Dissent contends that I "insist[ ] that SEPTA's sovereign immunity makes [compliance with the FPO] functionally impossible." Dissenting Op. at 4. I do not. It is entirely possible for SEPTA to be subjected to the FPO. But this is for the General Assembly to do by legislation rather than for this Court to do by judicial law-making. Nothing precludes the legislature from acting. The General Assembly's codification of SEPTA's sovereign immunity does not suggest any current legislative inclination to subject SEPTA to the quasi-litigation scheme imposed by the FPO. Nor do I "attempt[ ] to expand the protections of sovereign immunity exponentially," as the Dissent asserts. *Id.* Expansion and contraction are legislative functions. I interpret the law based upon the available evidence of the General Assembly's intent. I recognize and understand the limits of sovereign immunity as discussed by the Dissent. It is emphatically not my position that sovereign immunity, in and of itself, expressly prevents application of the FPO. Were that my belief, I would join the OAJC, and decide this appeal based upon the MTAA's plain language. I conclude only that the General Assembly did not intend here to subject SEPTA to the jurisdiction of a Philadelphia administrative body when it exempted SEPTA from litigation by conferring sovereign immunity upon it.

from discriminating against those classes protected by the FPO but not by the PHRA because "[n]o language in any of the relevant legislation suggests an intent by the General Assembly to permit SEPTA to engage" in such discrimination. *Id.* at 10. No legal authority supports this prohibition-by-implication approach to statutory interpretation. We are bound to glean the General Assembly's intent from its words when those words are clear. In unmistakable terms, the PHRA protects from discrimination only those classes enumerated therein. *Expressio unius est exclusio alterius.*[7]

The Dissent correctly interprets my position as "amount[ing] to an assertion that the General Assembly intended to require SEPTA to comply with some anti-discrimination laws (*i.e.,* those in the PHRA relating to discrimination based upon, *inter alia*, race, color, religious creed, ancestry, age or sex, 43 P.S. § 956(a)), but to be free from any obligation to comply with other anti-discrimination laws (*i.e.,* those in the FPO relating to discrimination based upon, *inter alia*, gender identity or sexual orientation, Phila. Code § 9-1103(1))." *Id.* at 9-10. I am compelled to draw that conclusion because I fail to see how we can take the liberty of inferring any other legislative intent.

---

[7] *See Atcovitz v. Gulph Mills Tennis Club, Inc.*, 812 A.2d 1218, 1223 (Pa. 2002) ("[U]nder the doctrine of *expressio unius est exclusio alterius*, the inclusion of a specific matter in a statute implies the exclusion of other matters."). As Justice Harlan observed in the federal context:

> [When] the question relates to matters of public policy . . . Congress alone can deal with the subject; [a] court would encroach upon the authority of Congress if, under the guise of construction, it should assume to determine a matter of public policy . . . . [The opponents of a statute] must go to Congress and obtain an amendment . . . if they think [it wrong] . . . . [T]his court cannot and will not judicially legislate, since its function is to declare the law, while it belongs to the legislative department to make the law.

*Standard Oil Co. of New Jersey v. United States*, 221 U.S. 1, 102 (1911).

Speaking generally, and relative to the instant context, state action that is not prohibited by the federal or state constitution, or by binding statute or precedent, necessarily is permitted.[8] In the PHRA, the General Assembly affirmatively chose to prohibit certain types of discrimination while affirmatively declining to prohibit others.

The deliberation behind the General Assembly's conspicuous omission of protections for those discriminated against based upon gender identity and sexual orientation is thrown into stark and glaring relief when viewed in a national context. Numerous other states have enacted legislation that, in relevant part, differs from our own PHRA only in the particular that, like Philadelphia's FPO and markedly unlike Pennsylvania's PHRA, these states prohibit discrimination on the basis of gender identity and sexual orientation.[9] This distinction cannot have been lost upon our legislature, which as recently as 2015 has considered and declined to pass proposed legislation that would bring Pennsylvania into step with those states that have added the

---

[8] No constitutional claim has been made in this case. Importantly, SEPTA would remain subject to federal and state anti-discrimination laws such as Title VII and the PHRA, as discussed herein.

[9] Unlike Pennsylvania, the following states and the District of Columbia have enacted laws that prohibit discrimination based upon sexual orientation and gender identity: California (Cal. E. Code § 1101; Cal. Civ. Code § 51 *et. cet.*), Colorado (C.R.S. 24-34-402; 24-34-601), Connecticut (Conn. Gen. Stat. §§ 46a-60, 46a-64), Delaware (Del. S.B. 121 (2009); Del. S.B. 97 (2013)), District of Columbia (D.C. Code §§ 2-1402.11, 2-1402.31), Hawaii (Haw. Rev. Stat. §§ 378-2, 489-3), Illinois (775 ILCS 5/2-102 (2005)), Iowa (Iowa Code §§ 216.86, 216.6a, 216.7 (2007)), Maine (5 Me. Rev. Stat. §§ 4571, 4572, 4591, 4592 (2005)), Maryland (Md. S.B. 212 (2014)), Massachusetts (Mass. Gen. Laws, ch. 151B, § 4, ch. 272, § 92A (1989)), Minnesota (Minn. Stat. §§ 363A.08, 363A.11 (1993)), Nevada (Nev. A.B. 311 (1999); Nev. A.B. 211 (2011); Nev. S.B. 207 (2009); Nev. S.B. 331 (2011)), New Hampshire (N.H. H.B. 421 (1997)), New Jersey (N.J. Stat. §§ 10:5-4, 10:5-12), New Mexico (N.M. Stat. Ann. § 28-1-7), New York (N.Y. S.B. 720 (2002)), Oregon (Or. S.B. 2 (2007)), Rhode Island (R.I. Gen. Laws. §§ 11-24-2 , 28-5-7), Utah (Utah S.B. 296 (2015)), Vermont (9 Vt. Stat. § 4502; 21 Vt. Stat. § 495), Washington (Wash. Rev. Code §§ 49-60-180, 49-60-215 (2006)), Wisconsin (Wis. Stat. §§ 106.52, 111.321, § 111.322, § 111.36 (1982)).

LGBT community to the classes protected against discrimination.[10]  This Court may not override that choice by seeking to improve upon or read into the PHRA what cannot fairly be inferred under our rules of statutory construction.[11]  Absent further developments in constitutional or federal law, only our General Assembly has the power to align Pennsylvania with Philadelphia and our numerous sister states that have chosen to provide legal protections to persons who suffer discrimination on the basis of their gender identity or sexual orientation.

Returning to the issue at bar, while subjecting SEPTA to the FPO is at odds with the MTAA's sovereign immunity provision, prohibiting Philadelphia from exercising jurisdiction over SEPTA under the FPO would not upset Philadelphia's local authority or the purposes of the FPO generally.  Philadelphia's contention that SEPTA—as the city's largest transportation provider—is a major public accommodation and target of the FPO is well taken.  However, it is hardly the only public accommodation in the city.  Our ruling does not prohibit Philadelphia from enforcing the FPO against any number of public and private entities that serve the public.  As in *Ogontz*, where we explained that the Commonwealth could effectuate its goal by constructing the mental health facility in

---

[10]     *See* House Bill 1510 (2015) ("Pennsylvania Fairness Act") (referred to State Government Committee) (proposed amendment to PHRA to prohibit discrimination based on sexual orientation, gender identity or gender expression); *see also* Claire Sasko, *Why Pennsylvania's Hate Crime Laws Still Lack LGBT Protections*, Phila. Mag., June 21, 2016, http://www.phillymag.com/news/2016/06/21/pennsylvania-hate-crime-laws/ (reporting that Pennsylvania Fairness Act stalled in the House State Government Committee because the majority chairman considered the bill "'dangerous' and that debate on the issue is 'futile' because he believes the bill will not win [a legislative] majority") (last reviewed Mar. 22, 2017).

[11]     As Justice Oliver Wendell Holmes, Jr. wrote, "[I]f my fellow citizens want to go to Hell I will help them.  It's my job."  Letter from Oliver Wendell Holmes, Jr., to Harold J. Laski, (Mar. 4, 1920), *in Holmes-Laski Letters*, at 249 (Mark DeWolfe Howe ed., vol. 1) (1953).

a different location, Philadelphia can carry out the purpose of the FPO by enforcing it against numerous other individuals and entities located within the city.[12]

Comparing the consequences of each party's proffered interpretation of the statutes, SEPTA's interpretation more effectively harmonizes the MTAA and Philadelphia's Home Rule Authority to enforce the FPO. As the OAJC emphasizes, the sovereign immunity provision expressly limits any entity from bringing suit against SEPTA. Maj. Op. at 17. Although sovereign immunity does not prohibit any and all local regulation of SEPTA, in purporting to subject SEPTA to an administrative scheme that mimics the rigors of litigation, the FPO contradicts the General Assembly's choice to immunize SEPTA from suit.

Finally, like the OAJC, I reject Philadelphia's claim that the PHRA waives SEPTA's sovereign immunity as to claims brought under the FPO. It is well-established and undisputed that sovereign immunity must be waived specifically by the General Assembly, 1 Pa.C.S. § 2310 ("[T]he Commonwealth . . . shall . . . remain immune from suit except as the General Assembly shall specifically waive the immunity . . . ."), and that we must construe exceptions to sovereign immunity narrowly. *See Dean v. Dep't of Transp.*, 751 A.2d 1130, 1132 (Pa. 2000) ("[T]he exceptions to immunity are to be strictly construed."). Notably, the PHRA specifically waives sovereign immunity for claims brought before the Pennsylvania Human Relations Commission ("PHRC"). *See*

---

[12] I agree with the Dissent that "[t]he aim of the FPO is not to protect some, but rather all, Philadelphians from the types of discrimination identified in the ordinance." Dissenting Op. at 10. I agree as well with the Dissent's conclusion that the General Assembly has "cede[d] local control over the extension of protections against discrimination for additional categories of citizens." Dissenting Op. at 7. Our decision in this case will leave all Philadelphians protected by the FPO, including "additional categories of citizens"—except when SEPTA is the entity alleged to be discriminating, because the General Assembly has not ceded local control over SEPTA. Elimination of this patent discrepancy is the prerogative of the legislature, not the judiciary.

43 P.S. § 954(a) (defining "person" to include "the Commonwealth of Pennsylvania, and all political subdivisions, authorities, boards and commissions thereof"); 43 P.S. § 954(b) (defining "employer" to include "the Commonwealth or any political subdivision or board, department, commission or school district thereof"). The PHRA also provides that "[t]he legislative body of a political subdivision may, by ordinance or resolution, authorize the establishment of membership in and support of a Local Human Relations Commission," 43 P.S. § 962.1(a), and that "legislative bodies of political subdivisions shall have the authority to grant to local commissions powers and duties similar to those now exercised by the [PHRC] under the provisions of [the PHRA]." 43 P.S. § 962.1(d). Philadelphia argues that, by granting local authorities "powers and duties similar to those" of the PHRC, the General Assembly effectively expanded the PHRA's waiver of sovereign immunity to the FPO and PHRC. However, the language of Section 962.1 does not speak specifically to waiver of sovereign immunity. As I read and consider Section 962.1, I am unable to discern the specific and clear language required to allow for importing the PHRA's waiver to the jurisdiction of local authorities. Should the General Assembly wish to enact such language, it may do so. We may not engraft such language onto a statute that lacks it through an act of judicial fiat.

As I survey the statutory landscape, I do not find the lawmakers' express will that SEPTA be subject to Philadelphia's jurisdiction under the FPO or equivalent local regulations. Similarly, I cannot locate any legislative mandate to exempt SEPTA from all forms of local regulation. The statutes are ambiguous. Accordingly, to ascertain the General Assembly's intent, we are constrained to fall back upon our familiar rules of statutory construction. Relying upon *Ogontz*'s formulation, I conclude that the intent of the General Assembly to shield SEPTA from litigation by granting it sovereign immunity is incompatible with subjecting SEPTA to Philadelphia's FPO. On this basis, I would

affirm the order of the Commonwealth Court prohibiting Philadelphia from enforcing the FPO against SEPTA.